# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 15, 2010      Decided October 4, 2011

No. 10-7036

DICK ANTHONY HELLER, ET AL.,
APPELLANTS

v.

DISTRICT OF COLUMBIA, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-01289)

*Stephen P. Halbrook* argued the cause for appellants. With him on the briefs was *Richard E. Gardiner*.

*William J. Olson*, *Herbert W. Titus*, and *John S. Miles* were on the brief for *amici curiae* Conservative Legal Defense and Education Fund, et al. in support of appellants.

*Todd S. Kim*, Solicitor General, Office of the Attorney General for the District of Columbia, argued the cause for appellees. With him on the brief were *Peter J. Nickles*, Attorney General, *Donna M. Murasky*, Deputy Solicitor General, and *Holly M. Johnson*, Assistant Attorney General.

*Matthew M. Shors* was on the brief for *amici curiae* Professional Historians and Law Professors, et al. in support of appellees.

*Paul R.Q. Wolfson*, *A. Stephen Hut, Jr.*, *Joshua M. Salzman*, and *Jonathan E. Lowy* were on the brief for *amici curiae* The Brady Center to Prevent Gun Violence, et al. in support of appellees.

Before: GINSBURG, HENDERSON and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GINSBURG.

| | |
|---|---|
| I. Background | 4 |
| II. Analysis | 8 |
| A. Statutory Authority | 9 |
| B. The Second Amendment | 12 |
| 1. The *Heller* Decision | 12 |
| 2. The Constitutional Framework | 13 |
| 3. Registration Requirements | 15 |
| a. Do the registration requirements impinge upon the Second Amendment right? | 15 |
| i. Basic registration requirements | 15 |
| ii. Novel registration requirements | 19 |
| b. Intermediate scrutiny is appropriate | 20 |
| c. Intermediate scrutiny requires remand | 24 |
| 4. Assault Weapons and Large-Capacity Magazines | 28 |
| a. Do the prohibitions impinge upon the Second Amendment right? | 29 |
| b. Intermediate scrutiny is appropriate | 31 |
| c. The prohibitions survive intermediate scrutiny | 33 |
| III. Conclusion | 36 |

3

Appendix: Regarding the Dissent                          36

    A. Interpreting *Heller* and *McDonald*          36
    B. Registration Requirements                      42
    C. Assault Weapons                                42

Dissenting opinion filed by *Circuit Judge* KAVANAUGH.

GINSBURG, *Circuit Judge*: In June 2008 the Supreme Court held the District of Columbia laws restricting the possession of firearms in one's home violated the Second Amendment right of individuals to keep and bear arms. *See District of Columbia v. Heller*, 554 U.S. 570. In the wake of that decision, the District adopted the Firearms Registration Amendment Act of 2008 (FRA), D.C. Law 17-372, which amended the Firearms Control Regulations Act of 1975, D.C. Law 1-85. The plaintiffs in the present case challenge, both facially and as applied to them, the provisions of the District's gun laws, new and old, requiring the registration of firearms and prohibiting both the registration of "assault weapons" and the possession of magazines with a capacity of more than ten rounds of ammunition. The plaintiffs argue those provisions (1) are not within the District's congressionally delegated legislative authority or, if they are, then they (2) violate the Second Amendment.

The district court granted summary judgment for the District and the plaintiffs appealed. We hold the District had the authority under D.C. law to promulgate the challenged gun laws, and we uphold as constitutional the prohibitions of assault weapons and of large-capacity magazines and some of the registration requirements. We remand the other registration requirements to the district court for further proceedings because the record is insufficient to inform our resolution of the important constitutional issues presented.

I. Background

In *Heller*, the Supreme Court held the Second Amendment protects "an individual right to keep and bear arms," 554 U.S. at 595, but not a right "to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *id.* at 626. More specifically, the Court held unconstitutional the District's "ban on handgun possession in the home" as well as its "prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense," *id.* at 635, noting "the inherent right of self-defense [is] central to the Second Amendment right," *id.* at 628. Therefore, unless the plaintiff was "disqualified from the exercise of Second Amendment rights" for some reason, such as a felony conviction, the District had to permit him to register his handgun. *Id.* at 635.

Shortly after the Supreme Court issued its decision in *Heller*, the D.C. Council passed emergency legislation in an effort to conform the District's laws to the Supreme Court's holding while it considered permanent legislation. The Council's Committee on Public Safety and the Judiciary then held three public hearings on the subject. In December 2008, upon the Committee's recommendation, the full Council passed the FRA. 56 D.C. Reg. 3438 (May 1, 2009).

The plaintiffs challenge a host of provisions of the new scheme for regulating firearms.[*] First they object to the

---

[*] Although the District revised its regulatory scheme, the ban on semi-automatic rifles and the registration scheme themselves are not entirely new. The District has banned all semi-automatic firearms shooting more than twelve shots without reloading and has required basic registration since 1932. *See* Act of July 8, 1932, ch. 465, §§ 1, 8, 47 Stat. 650, 650, 652. It enacted most of its

general requirement that owners register their firearms, D.C. Code § 7-2502.01(a). In particular, the plaintiffs challenge the following requirements that apply each time a person applies to the Metropolitan Police Department (MPD) for a registration certificate. Each applicant must:

- Disclose certain information about himself — such as his name, address, and occupation — and about his firearm. § 7-2502.03(b).

- Submit "for a ballistics identification procedure" each pistol to be registered. § 7-2502.03(d). Ballistics testing is not required for long guns. *See id.*

- Appear in person and, at the MPD's request, bring with him the firearm to be registered. § 7-2502.04(c).

- Register no more than one pistol in a 30-day period. § 7-2502.03(e).

- Renew each registration certificate "3 years after the date of issuance." § 7-2502.07a(a). In order to renew the certificate, the applicant must "submit a statement ... attesting to" his current address, possession of the firearm, and compliance with the registration requirements in § 7-2502.03(a). § 7-2502.07a(c).

In addition, the plaintiffs challenge five requirements that are more similar to licensing the owner of the firearm than to

---

comprehensive registration scheme in 1975. *See* Firearms Control Regulations Act of 1975, D.C. Law 1-85.

registering the weapon itself.[*] Specifically, the applicant must:

- Have vision qualifying one for a driver's license. § 7-2502.03(a)(11).

- Demonstrate knowledge of the District's laws pertaining to firearms "and, in particular, the safe and responsible use, handling, and storage of the same." § 7-2502.03(a)(10).

- Submit to being fingerprinted and photographed. § 7-2502.04; D.C. Mun. Regs. tit. 24, § 2312.1–2.

- Undergo a background check every six years to confirm his continuing compliance with the registration requirements in § 7-2502.03(a). § 7-2502.07a(d).

- Attend a firearms training or safety course providing "a total of at least one hour of firing training at a firing range and a total of at least 4 hours of classroom instruction." § 7-2502.03(a)(13)(A).

Second, the plaintiffs challenge the District's prohibitions of "assault weapon[s]," D.C. Code § 7-2502.02(a)(6), and of

---

[*] The plaintiffs also challenge several administrative and enforcement provisions incidental to the underlying regime. *See* D.C. Code §§ 7-2502.03(d), 7-2502.05(b), D.C. Mun. Regs. tit. 24, § 2320 (fees for registration, ballistics testing, and fingerprinting); D.C. Code § 7-2507.06 (violation punishable by fine of up to $1,000, one year in prison, or both); § 7-2502.08 (registrant must notify MPD if firearm is transferred, lost, stolen, or destroyed, and exhibit registration certificate upon demand of MPD). These provisions are lawful insofar as the underlying regime is lawful and hence enforceable.

magazines holding more than ten rounds of ammunition, § 7-2506.01(b). The FRA defines "assault weapon" to include certain brands and models of semi-automatic rifles, pistols, and shotguns, such as the Colt AR-15 series of rifles, as well as semi-automatic firearms with certain features, regardless of make and model, such as a semi-automatic rifle with a "pistol grip that protrudes conspicuously beneath the action of the weapon" or a "thumbhole stock." § 7-2501.01(3A)(A). The District also prohibits possession of "any large capacity ammunition feeding device," which includes "a magazine ... or similar device that has a capacity of ... more than 10 rounds of ammunition." § 7-2506.01(b) (hereinafter "large-capacity magazines").

Plaintiffs Mark Snyder and Absalom F. Jordan, Jr. complied with the registration requirements and successfully registered a rifle and a pistol respectively. Plaintiff Jordan, however, was unable to register two additional pistols due to the one-gun-per-30-days limit. Three of the plaintiffs, Dick Anthony Heller, William Carter, and Jordan applied to register semi-automatic rifles, but the MPD denied their applications because it found the firearms were prohibited "assault weapons." Plaintiff Heller was also denied registration of a pistol because the magazine had a capacity of 15 rounds.[*]

---

[*] In their complaint, the plaintiffs challenge the constitutionality of the FRA insofar as it bans all "assault weapons," including semi-automatic rifles, pistols, and shotguns. In their briefs, however, they recount no attempt to register a semi-automatic pistol or a semi-automatic shotgun of a kind prohibited by the District's ban on assault weapons, nor do they mention such weapons in arguing the ban is unconstitutional. Accordingly, we take their challenge to the ban on assault weapons as referring only to the ban on semi-automatic rifles, as set out in D.C. Code §§ 7-2501.01(3A)(A)(i)(I) and (IV). *See Summers v. Earth Island Inst.*, 129 S. Ct. 1142, 1149

Before the district court, the plaintiffs argued all D.C. gun laws are required by the Act of June 30, 1906, ch. 3932, 34 Stat. 808, to be "usual and reasonable," but contended the aforementioned provisions meet neither criterion or, if they do, then they violate the plaintiffs' Second Amendment rights. The district court held the challenged laws do not exceed the District's authority under local law because they are usual and reasonable police regulations within the meaning of the 1906 Act. 698 F. Supp. 2d 179, 196–97 (2010). Then, addressing the constitutional challenge, the court determined "the registration requirements plainly implicate the core Second Amendment right" but, applying intermediate scrutiny, upheld the registration scheme in all respects. *Id.* at 190–93. The court also upheld the ban on assault weapons and large-capacity magazines on the ground that the bans "do not implicate the core Second Amendment right." *Id.* at 195. Holding, in the alternative, the bans would survive intermediate scrutiny, *id.*, the court granted summary judgment for the District, and the plaintiffs appealed.

## II. Analysis

Pursuant to the principle of constitutional avoidance, we "resolve statutory questions at the outset where to do so might obviate the need to consider a constitutional issue." *United*

(2009) (standing doctrine "requires federal courts to satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction," and the plaintiff "bears the burden of showing that he has standing for each type of relief sought" (internal quotation marks omitted)); *Democratic Cent. Comm. v. Wash. Metro. Area Transit Comm'n*, 485 F.2d 786, 790 n.16 (D.C. Cir. 1973) (declining to consider claims because "[i]n their brief ... petitioners offer no argument whatever in support of these points").

*States v. Wells Fargo Bank*, 485 U.S. 351, 354 (1988). Accordingly, we consider first whether the D.C. Council had the statutory authority to enact the challenged gun laws.

A. Statutory Authority

The Congress in 1878 permanently established a Board of Commissioners, to which it delegated regulatory authority over the District in discrete areas of policy. Organic Act of June 11, 1878, ch. 180, 20 Stat. 102, 103; *see also District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 111 (1953) (under Organic Act, "municipal government was confined to mere administration" (internal quotation marks omitted)). The Congress passed the 1906 Act in part to grant the Board the specific authority to regulate firearms:

> the Commissioners of the District of Columbia are hereby authorized and empowered to make and enforce all such *usual and reasonable* police regulations ... as they may deem necessary for the regulation of firearms, projectiles, explosives, or weapons of any kind in the District of Columbia.

Act of June 30, 1906, ch. 3932, § 4, 34 Stat. 808, 809 (emphasis added), amended and codified at D.C. Code § 1-303.43 (referring to "Council" in lieu of "Commissioners").

In 1973 the Congress passed the District of Columbia Home Rule Act (HRA), *see* District of Columbia Self-Government and Governmental Reorganization Act, Pub. L. No. 93-198, 87 Stat. 774 (codified as amended at D.C. Code §§ 1-201.01 *et seq.*), which remains in effect today. Section 302 of the HRA, D.C. Code § 1-203.02, "Legislative Power," provides in relevant part:

> Except as provided in [certain sections not relevant here], the legislative power of the District shall extend to all rightful subjects of legislation within the District consistent with the Constitution of the United States and the provisions of this [Act] ....

The plaintiffs argue the District's authority to regulate firearms remains limited by the 1906 Act, and that Act prevents the District from promulgating the gun laws challenged here. Specifically, the plaintiffs argue the D.C. gun laws are not "usual" because they are not commonly found in either state or federal law and they are also unreasonable. (They maintain the Eighth Amendment case law concerning what is "unusual" should inform our analysis of whether these laws are "usual.") The District defends the challenged laws as both "usual and reasonable." It argues a regulation is "usual" if any other jurisdiction has or has had a law addressing similar subject matter.

In any event the District argues, and the United States as amicus curiae agrees, its authority in the HRA over "all rightful subjects of legislation" affirmatively gives it the power to enact the challenged gun laws. The plaintiffs respond to that argument with the observation that the 1906 Act should not be "deemed amended or repealed" because the HRA did not "specifically provide[]" for repeal and the 1906 Act is not "inconsistent with" the HRA. *See* D.C. Code § 1-207.17(b) ("No law or regulation which is in force on January 2, 1975 shall be deemed amended or repealed by [the HRA] except to the extent specifically provided herein or to the extent that such law or regulation is inconsistent with this chapter").

We agree with the District that it was authorized to enact the challenged gun laws. The HRA granted the District broad legislative power, subject to a few express exceptions, none of which is relevant here. *See* D.C. Code § 1-203.02; *id.* § 1-204.04(a). The plaintiffs do not contend the District's authority to enact these gun laws is limited by any other provision of the HRA, *see Marijuana Policy Project v. United States*, 304 F.3d 82, 83 (D.C. Cir. 2002) (HRA "lists certain matters that are not rightful subjects" of legislation, such as "a commuter tax on non-residents' income"), and the District of Columbia Court of Appeals has authoritatively if more generally said as much, *see Convention Ctr. Referendum Comm. v. D.C. Bd. of Elections & Ethics*, 441 A.2d 889, 903 (D.C. 1981) (en banc) (Council's legislative power "limited only by specified exceptions and by the general requirement that legislation be consistent with the U.S. Constitution and the Home Rule Act"). *See also John R. Thompson Co.*, 346 U.S. at 104–05, 110 (concluding Organic Act of February 21, 1871, 16 Stat. 419, which gave District power over "all rightful subjects of legislation," conferred authority "as broad as the police power of a state"). Hence we conclude the grant of authority in the HRA comprises the subject of firearms and supersedes the qualified grant to the District in the 1906 Act.

Insofar as the 1906 Act remains effective, it serves only to clarify that the new D.C. Council is the body responsible for the "function" of regulating firearms, as stated in D.C. Code § 1-303.43. Specifically, § 404(a) of the HRA provides

> all functions granted to or imposed upon, or vested in or transferred to the District of Columbia Council, as established by Reorganization Plan No. 3 of 1967, shall be carried out by the Council in accordance with the provisions of this chapter.

D.C. Code § 1-204.04(a). Accordingly, we need not decide whether the laws at issue are "usual and reasonable" because we hold the District has authority under the HRA to enact laws regulating firearms.

## B. The Second Amendment

Having determined the District had the statutory authority to promulgate the challenged gun laws, we next consider whether those laws are consistent with the Second Amendment: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." To determine how we are to approach this question, we begin with *Heller*.

### 1. The *Heller* Decision

In *Heller* the Supreme Court explained the Second Amendment "codified a *pre-existing*" individual right to keep and bear arms, 554 U.S. at 592, which was important to Americans not only to maintain the militia, but also for self-defense and hunting, *id.* at 599. Although "self-defense had little to do with the right's *codification*[,] it was the *central component* of the right itself." *Id.*

Still, the Court made clear "the right secured by the Second Amendment is not unlimited," *id.* at 626, and it gave some examples to illustrate the boundaries of that right. For instance, the Court noted "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Id.* at 625 (citing *United States v. Miller*, 307 U.S. 174 (1939)). This limitation upon the right to keep and bear arms was "supported by the historical tradition of prohibiting the

carrying of dangerous and unusual weapons." *Id.* at 627 (internal quotation marks omitted).

The Court identified other historical limitations upon the scope of the right protected by the Second Amendment. For example, it noted "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." *Id.* at 626. It also provided a list of some "presumptively lawful regulatory measures":

> nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626–27 & n.26. The Court made clear, however, it was not "undertak[ing] an exhaustive historical analysis today of the full scope of the Second Amendment." *Id.* at 626.

### 2. The Constitutional Framework

Under *Heller*, therefore, there are certain types of firearms regulations that do not govern conduct within the scope of the Amendment. We accordingly adopt, as have other circuits, a two-step approach to determining the constitutionality of the District's gun laws. *Ezell v. City of Chicago*, No. 10-3525, 2011 WL 2623511, at *12–13 (7th Cir. July 6, 2011); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Reese*, 627 F.3d 792, 800–01 (10th Cir. 2010); *United States v. Marzzarella*, 614

F.3d 85, 89 (3d Cir. 2010). We ask first whether a particular provision impinges upon a right protected by the Second Amendment; if it does, then we go on to determine whether the provision passes muster under the appropriate level of constitutional scrutiny. *See Ezell*, 2011 WL 2623511, at *12–13; *Chester*, 628 F.3d at 680; *Reese*, 627 F.3d at 800–01; *Marzzarella*, 614 F.3d at 89; *see also Nordyke v. King*, 644 F.3d 776, 786 (9th Cir. 2011) ("only regulations which substantially burden the right to keep and to bear arms trigger heightened scrutiny under the Second Amendment"). As explained below, and again in keeping with other circuits, we think that insofar as the laws at issue here do impinge upon a Second Amendment right, they warrant intermediate rather than strict scrutiny.

With respect to the first step, *Heller* tells us "longstanding" regulations are "presumptively lawful," 554 U.S. at 626–27 & n.26; that is, they are presumed not to burden conduct within the scope of the Second Amendment. *See McDonald v. City of Chicago*, 130 S. Ct. 3020, 3047 (2010) (*Heller* "did not cast doubt on [certain types of] longstanding regulatory measures"); *Chester*, 628 F.3d at 679 (*Heller* "acknowledged that the scope of the Second Amendment is subject to historical limitations"); *Marzzarella*, 614 F.3d at 91 (*Heller* indicates "longstanding limitations are exceptions to the right to bear arms"); *United States v. Rene E.*, 583 F.3d 8, 12 (1st Cir. 2009) (*Heller* "identified limits" of the Second Amendment based upon "various historical restrictions on possessing and carrying weapons"). This is a reasonable presumption because a regulation that is "longstanding," which necessarily means it has long been accepted by the public, is not likely to burden a constitutional right; concomitantly the activities covered by a longstanding regulation are presumptively not protected from regulation by the Second Amendment. A plaintiff may rebut this

presumption by showing the regulation does have more than a de minimis effect upon his right. A requirement of newer vintage is not, however, presumed to be valid.

3. Registration Requirements

To apply this analytical framework, we first consider whether each of the challenged registration requirements impinges upon the right protected by the Second Amendment. We uphold the requirement of mere registration because it is longstanding, hence "presumptively lawful," and the presumption stands unrebutted. Other registration requirements we remand to the district court, as explained below, for further proceedings.

a. Do the registration requirements impinge upon the Second Amendment right?

The plaintiffs argue the registration requirements are not longstanding and therefore not presumptively lawful, and in fact impermissibly burden the right protected by the Second Amendment. The District responds that registration requirements have been accepted throughout our history, are not overly burdensome, and therefore do not affect the right protected by the Second Amendment.

i. Basic registration requirements

The record supports the view that basic registration of handguns is deeply enough rooted in our history to support the presumption that a registration requirement is constitutional. The Court in *Heller* considered "prohibitions on the possession of firearms by felons" to be "longstanding" although states did not start to enact them until the early 20th century. *See* C. Kevin Marshall, *Why Can't Martha Stewart*

*Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 708 (2009) (noting "ban on convicts possessing firearms were unknown before World War I" and "compilation of laws in mid-1925 indicated that no State banned possession of long guns based on a prior conviction; that only six banned possession of concealable weapons on such basis; that, except for New York, ... even those laws dated from 1923 or later"). At just about the same time, states and localities began to require registration of handguns.

Registration typically required that a person provide to the local Government a modicum of information about the registrant and his firearm. A 1911 New York statute delegated the record keeping function to sellers of concealable firearms, requiring them to "keep a register" recording the "date of sale, name, age, occupation and residence of every purchaser of such a [firearm], together with the calibre, make, model, manufacturer's number or other mark of identification on such [firearm]," which register had to be "open at all reasonable hours for the inspection of any peace officer." Act of May 25, 1911, ch. 195, § 2, 1911 N.Y. Laws 444–45. Similar laws had already been enacted by Illinois, Act of Apr. 16, 1881, ¶ 90, and Georgia, Act of Aug. 12, 1910, No. 432, § 2, 1910 Ga. Laws 134, 135 (official who grants license to carry pistol or revolver "shall keep a record of the name of the person taking out such license, the name of the maker of the fire-arm to be carried, and the caliber and number of the same"). Other states were soon to do so. *See* Oregon, Act of Feb. 21, 1917, ch. 377, 1917 Or. Laws 804, 805–06; Michigan, Act of June 2, 1927, No. 372, § 9, 1927 Mich. Laws 887, 891 ("any person within this state who owns or has in his possession a pistol" must "present such weapon for safety inspection to the commissioner or chief of police .... A certificate of inspection shall thereupon be issued ... and kept as a permanent official record for a period of six years"). In

1917 California likewise required the purchaser of a concealable firearm to give the seller basic information about himself, including his name, address, occupation, physical description (height and color of skin, eyes, and hair), and about the weapon (caliber, make, model, number). Act of May 4, 1917, ch. 145, § 7, 1917 Cal. Laws 221, 222–23. Hawaii did the same in 1927, while still a territory, Small Arms Act, Act 206, § 9, 1927 Haw. Laws 209, 211, as did the Congress for the District of Columbia in 1932, *see* Act of July 8, 1932, ch. 465, § 8, 47 Stat. 650, 652.

In sum, the basic requirement to register a handgun is longstanding in American law, accepted for a century in diverse states and cities and now applicable to more than one fourth of the Nation by population.[*] Therefore, we presume

---

[*] Today seven states require registration of some or all firearms, including Hawaii, Haw. Rev. Stat. § 134-3(a), (b), (e) (registration of all firearms); California, Cal. Penal Code § 11106(c) (registration for sales of handguns); Michigan, Mich. Comp. Laws § 28.422(5) (purchaser must provide information to obtain "license" for each pistol); New Jersey, N.J. Rev. Stat. 2C:58-12 (registration of assault firearms); Louisiana, La. Rev. Stat. Ann. § 40:1783 (registration of firearms); Maryland, Md. Code Ann., Crim. Law § 4-303 (registration of pre-ban assault pistols); and Connecticut, Conn. Gen. Stat. § 53-202d(a) (registration of pre-ban assault weapons); as do some cities and counties, including Chicago, Municipal Code §§ 8-20-140 *et seq.* (registration of all firearms); New York City, Admin. Code, §§ 10-304(a), (f) (registration of rifles and shotguns); Las Vegas, Mun. Code § 10.66.140 (registration of handguns); Omaha, Mun. Code § 20-251 (registration of "any concealable firearm"); Cleveland, Offenses & Bus. Activities Code §§ 674.02, 674.05 (registration card required for each handgun) (but preempted by Ohio Rev. Code Ann. § 9.68(A)); and Clark County, Nevada, Code § 12.04.110 (registration of handguns). Moreover, several states require sellers to report to law enforcement information about firearm sales

the District's basic registration requirement, D.C. Code § 7-2502.01(a), including the submission of certain information, § 7-2502.03(b), does not impinge upon the right protected by the Second Amendment. Further, we find no basis in either the historical record or the record of this case to rebut that presumption. Indeed, basic registration requirements are self-evidently de minimis, for they are similar to other common registration or licensing schemes, such as those for voting or for driving a car, that cannot reasonably be considered onerous. *Cf. Rosario v. Rockefeller*, 410 U.S. 753, 754–58 (1973) (law "requir[ing] a voter to enroll in the party of his choice at least 30 days before the general election in November in order to vote in the next subsequent party primary" does not violate First and Fourteenth Amendments because "if [the petitioners'] plight [could] be characterized as disenfranchisement at all, it was not caused by [the law], but by their own failure to take timely steps to effect their enrollment"); *id.* at 760 ("the State is certainly justified in imposing some reasonable cutoff point for registration or party enrollment, which citizens must meet in order to participate in the next election"); *Justice v. Town of Cicero*, 577 F.3d 768, 773–74 (7th Cir. 2009) ("ordinance requiring the registration of all firearms ... appears to be consistent with the ruling in *Heller*"). These early registration requirements, however, applied with only a few exceptions solely to handguns — that is, pistols and revolvers — and not to long guns. Consequently, we hold the basic registration requirements are constitutional only as applied to handguns. With respect to long guns they are novel, not historic.

---

identifying the purchaser and the firearm. *See* Legal Cmty. Against Violence, *Regulating Guns in America: An Evaluation and Comparative Analysis of Federal, State, and Selected Local Guns Laws*, 253 (Feb. 2008), http://www.lcav.org/publications-briefs/reports_analyses/RegGuns.entire.report.pdf (identifying ten states).

### ii. Novel registration requirements

Several other of the District's registration requirements are not longstanding, including the ballistics-identification provision, D.C. Code § 7-2502.03(d), the one-pistol-per-30-days rule, § 7-2502.03(e), and the requirements that applicants appear in person, § 7-2502.04(c), and re-register each firearm after three years, §§ 7-2502.07a(a)–(c). Certain portions of the law that are more akin to licensing the gun owner than to registering the gun are also novel; these include the requirement that an applicant demonstrate knowledge about firearms, § 7-2502.03(a)(10), be fingerprinted and photographed, §§ 7-2502.04(a)–(b), take a firearms training or safety course, § 7-2502.03(a)(13)(A), meet a vision requirement, § 7-2502.03(a)(11), and submit to a background check every six years, § 7-2502.07a(d).[*]

The requirements that are not longstanding, which include, in addition to those listed in the prior paragraph, *all* the requirements as applied to long guns, also affect the Second Amendment right because they are not de minimis.[**]

---

[*] Although some types of licensure have been required by some states since the early 20th century, *see, e.g.*, Act of Apr. 6, 1909, ch. 114, § 3, 1909 N.H. Laws 451, 451–52 (license "to carry a loaded pistol or revolver"); Small Arms Act, Act 206, §§ 5, 7, 1927 Haw. Laws 209, 209–11 (license to carry a pistol or revolver outside the home), the District's particular requirements are novel, not longstanding.

[**] The requirement of basic registration as applied to long guns may also be de minimis. For now, however, we assume this requirement, too, impinges upon the Second Amendment right because, as we discuss below, the record is devoid of information concerning the application of registration requirements to long guns. On remand and with the benefit of additional evidence, the

All of these requirements, such as the mandatory five hours of firearm training and instruction, § 7-2502.03(a)(13)(A), make it considerably more difficult for a person lawfully to acquire and keep a firearm, including a handgun, for the purpose of self-defense in the home — the "core lawful purpose" protected by the Second Amendment, *Heller*, 554 U.S. at 630. Because they impinge upon that right, we must determine whether these requirements are constitutional.[*] In order to do that, however, we must first determine the degree of scrutiny to which they are appropriately subject.

### b. Intermediate scrutiny is appropriate

The plaintiffs argue strict scrutiny is the appropriate standard of review because, in holding the Fourteenth Amendment made the Second Amendment applicable to the States, the Court in *McDonald* described the right "to keep and bear arms [as] among those fundamental rights necessary to our system of ordered liberty," 130 S. Ct. at 3042. The District responds that strict scrutiny would be inappropriate because, among other reasons, the right to keep and carry arms has always been heavily regulated; it argues we should

---

district court will be better able to address this question in the first instance.

[*] We note that some of the plaintiffs' arguments — in particular with respect to the provisions requiring registrants to demonstrate knowledge about firearms, meet a vision standard, and take a training course — are so cursory we might, in other circumstances, consider them forfeit. *See United States v. Law*, 528 F.3d 888, 908 n.11 (D.C. Cir. 2008) (appellant's argument forfeited "because he failed to develop it"). As we will in any event be remanding other registration requirements to the district court, however, *see* Part II.B.3.c, we see no reason to foreclose these particular plaintiffs from fleshing out their arguments as well as supplementing the record, if they can.

adopt a "reasonable-regulation test." The plaintiffs, in turn, contend *Heller* forecloses a "reasonableness" test.

*Heller* clearly does reject any kind of "rational basis" or reasonableness test, *see* 554 U.S. at 628 n.27, but it leaves open the question what level of scrutiny we are to apply to laws regulating firearms. True, the Supreme Court often applies strict scrutiny to legislation that impinges upon a fundamental right. *See, e.g.*, *Clark v. Jeter*, 486 U.S. 456, 461 (1988) ("classifications affecting fundamental rights are given the most exacting scrutiny" (citation omitted)). In applying strict scrutiny, the Court requires the Government to prove its law "furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United v. FEC*, 130 S. Ct. 876, 898 (2010) (internal quotation marks omitted). The Court has not said, however, and it does not logically follow, that strict scrutiny is called for whenever a fundamental right is at stake. *See, e.g.*, *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (applying intermediate scrutiny to restrictions on "time, place, or manner of protected speech"); *Marzzarella*, 614 F.3d at 96 ("Strict scrutiny does not apply automatically any time an enumerated right is involved"); *Chester*, 628 F.3d at 682 ("We do not apply strict scrutiny whenever a law impinges upon a right specifically enumerated in the Bill of Rights"); Adam Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683, 697–98, 700 (2007) ("mere fact of 'fundamentality' does not answer the question of what would be the appropriate standard of review for the right to bear arms" as "many of the individual rights in the Bill of Rights do not trigger strict scrutiny, including many that are incorporated," and "[e]ven among those incorporated rights that do prompt strict scrutiny, such as the freedom of speech and of religion, strict scrutiny is only occasionally applied"). *Cf. Mills v. Habluetzel*, 456 U.S. 91, 98–99 (1982) (disabilities attendant to illegitimacy are constitutional "to the

extent they are substantially related to a legitimate state interest"); *Craig v. Boren*, 429 U.S. 190, 197 (1976) ("classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives").

As with the First Amendment, the level of scrutiny applicable under the Second Amendment surely "depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *Chester*, 628 F.3d at 682; *see also Turner Broad. Sys., Inc. v. FCC* (*Turner I*), 512 U.S. 622, 642 (1994) ("regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue" (citation omitted)); *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985) ("We recognize that unjustified or unduly burdensome disclosure requirements might offend the First Amendment by chilling protected commercial speech. But we hold that an advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers."); Nelson Lund, *The Second Amendment,* Heller*, and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343, 1376 (2009) ("The case law dealing with free speech and the free exercise of religion provides a particularly good analogue" for Second Amendment). That is, a regulation that imposes a substantial burden upon the core right of self-defense protected by the Second Amendment must have a strong justification, whereas a regulation that imposes a less substantial burden should be proportionately easier to justify. *See Turner I*, 512 U.S. at 661 ("must-carry provisions do not pose such inherent dangers to free expression ... as to justify application of the most exacting level of First Amendment scrutiny"; rather,

"the appropriate standard ... is the intermediate level of scrutiny applicable to content-neutral restrictions that impose an incidental burden on speech"); *Board of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477 (1989) ("commercial speech [enjoys] a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values" (internal quotation marks omitted)); *Buckley v. Valeo*, 424 U.S. 1, 44–45 (1976) ("expenditure limitations" are subject to "exacting scrutiny applicable to limitations on core First Amendment rights of political expression" because they impose a "great[] burden on basic freedoms"); *Ezell*, 2011 WL 2623511, at \*13 (level of scrutiny "will depend on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right"); *see also* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1471 (2009) ("Ballot access regulations are ... subject to strict scrutiny if they 'impose a severe burden on associational rights,' but to a much weaker level of scrutiny if they 'impose[] only modest burdens'" (quoting *Wash. State Grange v. Wash. State Republican Party*, 128 S. Ct. 1184, 1191–92 (2008))); Winkler, *supra*, at 698 ("Strict scrutiny ... does not apply to fundamental, preferred rights when the courts determine that the underlying burden is only incidental").

As between strict and intermediate scrutiny, we conclude the latter is the more appropriate standard for review of gun registration laws. As the Third Circuit reasoned in *Marzzarella* with regard to a prohibition on possession of a firearm with the serial numbers obliterated, registration requirements "do[] not severely limit the possession of firearms." 614 F.3d at 97. Indeed, none of the District's registration requirements prevents an individual from

possessing a firearm in his home or elsewhere, whether for self-defense or hunting, or any other lawful purpose.

c.    Intermediate scrutiny requires remand

As for the novel registration requirements, to pass muster under intermediate scrutiny the District must show they are "substantially related to an important governmental objective." *Clark*, 486 U.S. at 461; *see also United States v. Williams*, 616 F.3d 685, 692–94 (7th Cir. 2010) (prohibition of firearm possession by felons survives intermediate scrutiny). That is, the District must establish a tight "fit" between the registration requirements and an important or substantial governmental interest, a fit "that employs not necessarily the least restrictive means but ... a means narrowly tailored to achieve the desired objective." *Fox*, 492 U.S. at 480; *see also Ward*, 491 U.S. at 782–83 ("The requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation, and the means chosen are not substantially broader than necessary to achieve that interest"). We think the District has advanced, albeit incompletely — almost cursorily — articulated, two important governmental interests it may have in the registration requirements, *viz.*, to protect police officers and to aid in crime control. *Cf. United States v. Salerno*, 481 U.S. 739, 750 (1987) ("the Government's general interest in preventing crime is compelling"). The Council Committee on Public Safety explained: "Registration is critical because it ... allows officers to determine in advance whether individuals involved in a call may have firearms ... [and] assists law enforcement in determining whether registered owners are

eligible to possess firearms or have fallen into a prohibited class."[*] Report on Bill 17-843, at 3–4 (Nov. 25, 2008).

We cannot conclude, however, that the novel registration requirements — or any registration requirement as applied to long guns — survive intermediate scrutiny based upon the record as it stands because the District has not demonstrated a close fit between those requirements and its governmental interests. In support of the registration requirements, the District relies upon the Committee Report on the FRA, along with testimony and written statements submitted to the Committee at public hearings. Even so, the record is inadequate for us confidently to hold the registration requirements are narrowly tailored.

For example, the Committee Report asserts "studies show" that "laws restricting multiple purchases or sales of firearms are designed to reduce the number of guns entering the illegal market and to stem the flow of firearms between states," and that "handguns sold in multiple sales to the same individual purchaser are frequently used in crime." *Id.* at 10. The Report neither identifies the studies relied upon nor claims those studies showed the laws achieved their purpose,

---

[*] On remand, the District will have an opportunity to explain in greater detail how these governmental interests are served by the novel registration requirements. The Committee also thought registration useful because it "gives law enforcement essential information about firearm ownership, ... permits officers to charge individuals with a crime if an individual is in possession of an unregistered firearm, and permits officers to seize unregistered weapons." Report on Bill 17-843, at 3–4 (Nov. 25, 2008). These rationales are circular, however, and do not on their own establish either an important interest of the Government or a substantial relationship between the registration of firearms and an important interest.

nor in any other way attempts to justify requiring a person who registered a pistol to wait 30 days to register another one. The record does include testimony that offers cursory rationales for some other requirements, such as safety training and demonstrating knowledge of gun laws, *see, e.g.*, Testimony of Cathy L. Lanier, Chief of Police, at 2 (Oct. 1, 2008), but the District fails to present any data or other evidence to substantiate its claim that these requirements can reasonably be expected to promote either of the important governmental interests it has invoked (perhaps because it was relying upon the asserted interests we have discounted as circular).

Although we do "accord substantial deference to the predictive judgments" of the legislature, *Turner Broad. Sys., Inc. v. FCC* (*Turner II*), 520 U.S. 180, 195 (1997) (quoting *Turner I*, 512 U.S. at 665) (internal quotation marks omitted), the District is not thereby "insulated from meaningful judicial review," *Turner I*, 512 U.S. at 666 (controlling opinion of Kennedy, J.); *see also City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 440 (2002) (plurality opinion) (citing *Turner I* and "acknowledg[ing] that the Los Angeles City Council is in a better position than the Judiciary to gather and evaluate data on local problems"). Rather, we must "assure that, in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence." *Turner II*, 520 U.S. at 195 (quoting *Turner I*, 512 U.S. at 666) (internal quotation marks omitted). Therefore, the District needs to present some meaningful evidence, not mere assertions, to justify its predictive judgments. On the present record, we conclude the District has not supplied evidence adequate to show a substantial relationship between any of the novel registration requirements and an important governmental interest.

Nor, however, do the plaintiffs present more meaningful contrary evidence concerning handguns, and neither the District nor the plaintiffs present any evidence at all concerning application of the registration requirements to long guns. The parties' mutual failure in their briefs to distinguish between handguns and long guns points up a significant deficiency in the present record.[*] The Committee Report implicitly acknowledged the distinction between handguns and long guns only back-handedly, quoting *Heller* to emphasize specifically "the problem of handgun violence in this country" before discussing the proposed FRA. Report on Bill 17-843, at 3 (Nov. 25, 2008). Handguns indeed appear to have been the exclusive subject of the Committee's concern. Nowhere in the Report is there even a single reference to the need for registration of rifles or shotguns. For all the legislative record and the record in this case reveal, the provisions of the FRA that deal specifically with registration of long guns might have been written in invisible ink.

In the light of these evidentiary deficiencies and "the importance of the issues" at stake in this case, taking our cue from the Supreme Court in *Turner I*, we believe the parties should have an opportunity "to develop a more thorough factual record." 512 U.S. at 664–68 (controlling opinion of Kennedy, J.). In *Turner I*, the Court had determined intermediate scrutiny was appropriate for the First Amendment challenge at issue. "On the state of the record developed [that] far," however, the Government was unable to show the law was narrowly tailored. *Id.* at 665. Rather than invalidate a legislative judgment based upon that

---

[*] While the Court in *Heller* observed that the handgun is "the quintessential self-defense weapon," 554 U.S. at 629, a rifle or shotgun is the firearm of choice for hunting, which activity *Heller* recognized as providing one basis for the right to keep and bear arms, albeit not the central one, *id.* at 599.

shortcoming, the Court remanded the case for development of "a more thorough factual record." *Id.* at 668. We follow suit by remanding the novel registration requirements, and all registration requirements as applied to long guns, to the district court for further evidentiary proceedings.

### 4. Assault Weapons and Large-Capacity Magazines

Because the plaintiffs fail to present an argument in their briefs questioning the constitutionality of the ban on semi-automatic pistols and shotguns, *see* page 7 footnote * above, we construe the plaintiffs' challenge to the ban on assault weapons as going only to the prohibition of certain semi-automatic rifles. We are not aware of evidence that prohibitions on either semi-automatic rifles or large-capacity magazines are longstanding and thereby deserving of a presumption of validity.[*] For the court to determine whether these prohibitions are constitutional, therefore, we first must ask whether they impinge upon the right protected by the Second Amendment. That is, prohibiting certain arms might not meaningfully affect "individual self-defense, [which] is 'the *central component*' of the Second Amendment right." *McDonald*, 130 S. Ct. at 3036 (quoting *Heller*, 554 U.S. at 599). Of course, the Court also said the Second Amendment protects the right to keep and bear arms for other "lawful purposes," such as hunting, but self-defense is the "core lawful purpose" protected, *Heller*, 554 U.S. at 630.

---

[*] We know of only two exceptions: the Act of July 8, 1932, ch. 465, §§ 1, 8, 47 Stat. 650, 650, 652, in which the Congress banned in D.C. "any firearm which shoots ... semiautomatically more than twelve shots without reloading," and the Act of June 2, 1927, No. 372, § 3, 1927 Mich. Laws 887, 888, which prohibited the possession of any "firearm which can be fired more than sixteen times without reloading."

The Court in *Heller*, as mentioned above at pages 12–13, recognized yet another "limitation on the right to keep and carry arms," namely that the "sorts of weapons protected" are those "'in common use at the time' for lawful purposes like self-defense." *Id.* at 624, 627. The Court found this limitation "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 627. Because the prohibitions at issue, unlike the registration requirements, apply only to particular classes of weapons, we must also ask whether the prohibited weapons are "typically possessed by law-abiding citizens for lawful purposes," *id.* at 625; if not, then they are not the sorts of "Arms" protected by the Second Amendment.

> a. Do the prohibitions impinge upon the Second Amendment right?

The plaintiffs contend semi-automatic rifles, in particular the AR variants, are commonly possessed for self-protection in the home as well as for sport. They also argue magazines holding more than ten rounds are commonly possessed for self-defense and for other lawful purposes and that the prohibition of such magazines would impose a burden upon them. Specifically, they point out that without a large-capacity magazine it would be necessary, in a stressful situation, to pause in order to reload the firearm.

The District, by contrast, argues neither assault weapons nor weapons with large-capacity magazines are among the "Arms" protected by the Second Amendment because they are both "dangerous and unusual," *Heller*, 554 U.S. at 627 (internal quotation marks omitted), and because prohibiting them minimally burdens the plaintiffs; hence the District maintains the bans are constitutional. The Committee on Public Safety received evidence that assault weapons are not

useful for the purposes of sporting or self-defense, but rather are "military-style" weapons designed for offensive use. *See generally* Testimony of Brian J. Siebel, Brady Center to Prevent Gun Violence (Oct. 1, 2008). The Committee concluded assault weapons "have no legitimate use as self-defense weapons, and would in fact increase the danger to law-abiding users and innocent bystanders if kept in the home or used in self-defense situations." Report on Bill 17-843, at 7 (Nov. 25, 2008).

The District likewise contends magazines holding more than ten rounds are disproportionately involved in the murder of law enforcement officers and in mass shootings, and have little value for self-defense or sport. It cites the Siebel testimony, which relies upon a report of the federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) stating that semi-automatic rifles with large-capacity magazines are not suitable for sporting purposes. The District also reasons that the usefulness of large-capacity magazines for self-defense in rare circumstances does not mean the burden imposed upon the plaintiffs is more than minimal.

We think it clear enough in the record that semi-automatic rifles and magazines holding more than ten rounds are indeed in "common use," as the plaintiffs contend. Approximately 1.6 million AR-15s alone have been manufactured since 1986, and in 2007 this one popular model accounted for 5.5 percent of all firearms, and 14.4 percent of all rifles, produced in the U.S. for the domestic market. As for magazines, fully 18 percent of all firearms owned by civilians in 1994 were equipped with magazines holding more than ten rounds, and approximately 4.7 million more such magazines were imported into the United States between 1995 and 2000. There may well be some capacity above which magazines are not in common use but, if so, the record is

devoid of evidence as to what that capacity is; in any event, that capacity surely is not ten.

Nevertheless, based upon the record as it stands, we cannot be certain whether these weapons are commonly used or are useful specifically for self-defense or hunting and therefore whether the prohibitions of certain semi-automatic rifles and magazines holding more than ten rounds meaningfully affect the right to keep and bear arms. We need not resolve that question, however, because even assuming they do impinge upon the right protected by the Second Amendment, we think intermediate scrutiny is the appropriate standard of review and the prohibitions survive that standard.

### b. Intermediate scrutiny is appropriate

As we did in evaluating the constitutionality of certain of the registration requirements, we determine the appropriate standard of review by assessing how severely the prohibitions burden the Second Amendment right. Unlike the law held unconstitutional in *Heller*, the laws at issue here do not prohibit the possession of "the quintessential self-defense weapon," to wit, the handgun. 554 U.S. at 629. Nor does the ban on certain semi-automatic rifles prevent a person from keeping a suitable and commonly used weapon for protection in the home or for hunting, whether a handgun or a non-automatic long gun. *See* Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. Crim. L. & Criminology 150, 185 (1995) (revolvers and semi-automatic pistols are together used almost 80% of the time in incidents of self-defense with a gun); Dep't of Treasury, *Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles* 38 (1998) (semi-automatic assault rifles studied are "not generally recognized as particularly suitable for or readily adaptable to sporting

purposes"). Although we cannot be confident the prohibitions impinge at all upon the core right protected by the Second Amendment, we are reasonably certain the prohibitions do not impose a substantial burden upon that right. As the District points out, the plaintiffs present hardly any evidence that semi-automatic rifles and magazines holding more than ten rounds are well-suited to or preferred for the purpose of self-defense or sport. *Cf.* Kleck & Gertz, *supra*, at 177 (finding that of 340,000 to 400,000 instances of defensive gun use in which the defenders believed the use of a gun had saved a life, 240,000 to 300,000 involved handguns). Accordingly, we believe intermediate rather than strict scrutiny is the appropriate standard of review.

In this we agree with the reasoning of the Third Circuit in *Marzzarella*. The court there applied intermediate scrutiny to the prohibition of unmarked firearms in part because it thought the ban was similar to a regulation "of the manner in which ... speech takes place," a type of regulation subject to intermediate scrutiny "under the time, place, and manner doctrine" of the First Amendment. 614 F.3d at 97. Notably, because the prohibition left a person "free to possess any otherwise lawful firearm," the court reasoned it was "more accurately characterized as a regulation of the manner in which persons may lawfully exercise their Second Amendment rights." *Id.* Here, too, the prohibition of semi-automatic rifles and large-capacity magazines does not effectively disarm individuals or substantially affect their ability to defend themselves. *See* Volokh, *supra*, at 1471 ("where content-neutral speech restrictions are involved, restrictions that impose severe burdens (because they don't leave open ample alternative channels) must be judged under strict scrutiny, but restrictions that impose only modest burdens (because they do leave open ample alternative

channels) are judged under a mild form of intermediate scrutiny").

  c. The prohibitions survive intermediate scrutiny

  Recall that when subject to intermediate scrutiny the Government has the burden of showing there is a substantial relationship or reasonable "fit" between, on the one hand, the prohibition on assault weapons and magazines holding more than ten rounds and, on the other, its important interests in protecting police officers and controlling crime. The record evidence substantiates that the District's prohibition is substantially related to those ends.

  The Committee on Public Safety relied upon a report by the ATF, which described assault weapons as creating "mass produced mayhem." *Assault Weapons Profile* 19 (1994). This description is elaborated in the Siebel testimony for the Brady Center: "the military features of semiautomatic assault weapons are designed to enhance their capacity to shoot multiple human targets very rapidly" and "[p]istol grips on assault rifles ... help stabilize the weapon during rapid fire and allow the shooter to spray-fire from the hip position." The same source also suggests assault weapons are preferred by criminals and place law enforcement officers "at particular risk ... because of their high firepower," as does the ATF, *see* Dep't of Treasury, *Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles* 34–35, 38 (1998). *See also* Christopher S. Koper et al., U. Penn. Jerry Lee Ctr. of Criminology, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994–2003*, at 51, 87 (2004) (assault weapons "account for a larger share of guns used in mass murders and murders of police, crimes for which weapons with greater firepower would seem particularly useful," and "criminal use of [assault

weapons] ... declined after" the federal assault weapons ban enacted in 1994 "independently of trends in gun crime"); *id.* at 11 ("AR-15 type rifles are civilian weapons patterned after the U.S. military's M-16 rifle and were the assault rifles most commonly used in crime before the ban" in federal law from 1994 to 2004).

*Heller* suggests "M-16 rifles and the like" may be banned because they are "dangerous and unusual," *see* 554 U.S. at 627. The Court had previously described the "AR-15" as "the civilian version of the military's M-16 rifle." *Staples v. United States*, 511 U.S. 600, 603 (1994). Although semi-automatic firearms, unlike automatic M-16s, fire "only one shot with each pull of the trigger," *id.* at 602 n.1, semi-automatics still fire almost as rapidly as automatics. *See* Testimony of Brian J. Siebel, Brady Center to Prevent Gun Violence, at 1 (Oct. 1, 2008) ("30-round magazine" of UZI "was emptied in slightly less than two seconds on full automatic, while the same magazine was emptied in just five seconds on semiautomatic"). Indeed, it is difficult to draw meaningful distinctions between the AR-15 and the M-16. *See Staples*, 511 U.S. at 603 ("Many M-16 parts are interchangeable with those in the AR-15 and can be used to convert the AR-15 into an automatic weapon"); Koper, *supra*, at 4 (AR-15 and other federally banned assault weapons "are civilian copies of military weapons and accept ammunition magazines made for those military weapons"). In short, the evidence demonstrates a ban on assault weapons is likely to promote the Government's interest in crime control in the densely populated urban area that is the District of Columbia. *See* Comm. on Pub. Safety, Report on Bill 17-593, at 4 (Nov. 25, 2008) ("The District shares the problem of gun violence with other dense, urban jurisdictions").

The record also supports the limitation on magazine capacity to ten rounds. The Committee relied upon Siebel's testimony that "[t]he threat posed by military-style assault weapons is increased significantly if they can be equipped with high-capacity ammunition magazines" because, "[b]y permitting a shooter to fire more than ten rounds without reloading, they greatly increase the firepower of mass shooters." *See also* Koper, *supra*, at 87 ("guns used in shootings are 17% to 26% more likely to have [magazines holding more than ten rounds] than guns used in gunfire cases resulting in no wounded victims"); *id.* at 97 ("studies ... suggest that attacks with semiautomatics — including [assault weapons] and other semiautomatics with [magazines holding more than ten rounds] — result in more shots fired, persons wounded, and wounds per victim than do other gun attacks"). The Siebel testimony moreover supports the District's claim that high-capacity magazines are dangerous in self-defense situations because "the tendency is for defenders to keep firing until all bullets have been expended, which poses grave risks to others in the household, passersby, and bystanders." Moreover, the Chief of Police testified the "2 or 3 second pause" during which a criminal reloads his firearm "can be of critical benefit to law enforcement." Overall the evidence demonstrates that large-capacity magazines tend to pose a danger to innocent people and particularly to police officers, which supports the District's claim that a ban on such magazines is likely to promote its important governmental interests.

We conclude the District has carried its burden of showing a substantial relationship between the prohibition of both semi-automatic rifles and magazines holding more than ten rounds and the objectives of protecting police officers and controlling crime. Accordingly, the bans do not violate the plaintiffs' constitutional right to keep and bear arms.

### III. Conclusion

For the reasons stated above, we affirm the judgment of the district court with respect, first, to the requirement of mere registration as applied to handguns and expressed in D.C. Code §§ 7-2502.01(a) and 7-2502.03(b), and second, to the ban on "assault weapons" and large-capacity magazines, as they are defined in §§ 7-2502.02(a)(6), 7-2501.01(3A)(A)(i)(I), (IV), and 7-2506.01(b). With respect to the registration requirements in §§ 7-2502.03(a)(10), 7-2502.03(a)(11), 7-2502.03(a)(13)(A), 7-2502.03(d), 7-2502.03(e), 7-2502.04, and 7-2502.07a, and all the registration requirements (including §§ 7-2502.01(a) and 7-2502.03(b)) as applied to long guns, *see* Part II.B.3.c, the judgment is vacated and this matter is remanded to the district court for further proceedings consistent with this opinion.

*So ordered.*

### Appendix: Regarding the Dissent

Our colleague has issued a lengthy dissenting opinion explaining why he would strike down both the District's registration requirements and its ban on semi-automatic rifles. We respond to his main arguments below.

#### A. Interpreting *Heller* and *McDonald*

A substantial portion of the dissent is devoted to arguing *Heller* and *McDonald* preclude the application of heightened (intermediate, or for that matter, strict) scrutiny in all Second Amendment cases. The dissent reasons that *Heller* rejected balancing tests and that heightened scrutiny is a type of

balancing test. As we read *Heller*, the Court rejected only Justice Breyer's proposed "interest-balancing" inquiry, which would have had the Court ask whether the challenged statute "burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests." 554 U.S. at 689–90 (Breyer J., dissenting). That is, Justice Breyer, rather than ask merely whether the Government is promoting an important interest by way of a narrowly tailored means, as we do here, would have had courts in Second Amendment cases decide whether the challenged statute "imposes burdens that, when viewed in light of the statute's legitimate objectives, are disproportionate." *Id.* at 693. Thus, although Justice Breyer would have had us assess whether the District's handgun ban "further[s] the sort of life-preserving and public-safety interests that the Court has called 'compelling,'" *id.* at 705 (citation omitted), the key to his "interest-balancing" approach was "proportionality"; that is, he would have had us weigh this governmental interest against "the extent to which the District's law burdens the interests that the Second Amendment seeks to protect," *id.* at 706.

Our dissenting colleague asserts (at 25) heightened scrutiny is also "a form of interest balancing" and maintains that strict and intermediate scrutiny "always involve at least some assessment of whether the law in question is sufficiently important to justify infringement on an individual constitutional right." Although, as he points out, the Supreme Court has in a few opinions applying heightened scrutiny — out of scores if not hundreds of such opinions — used the word "balance," heightened scrutiny is clearly not the "interest-balancing inquiry" proposed by Justice Breyer and rejected by the Court in *Heller*. The Court there said, Justice Breyer's proposal did not correspond to any of "the traditionally expressed levels (strict scrutiny, intermediate

scrutiny, rational basis)," 554 U.S. at 634, but was rather "a judge-empowering 'interest-balancing inquiry'" that would have a court weigh the asserted governmental interests against the burden the Government would place upon exercise of the Second Amendment right, a balancing that is not part of either strict or intermediate scrutiny.

The dissent further contends *McDonald* confirms the Supreme Court's rejection of heightened scrutiny in Second Amendment cases because a plurality of the Court there said "Justice Breyer is incorrect that incorporation will require judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise." 130 S. Ct. at 3050. That observation was clearly and specifically directed to Justice Breyer's interest-balancing inquiry, as the very next sentence shows: "As we have noted, while his opinion in *Heller* recommended an interest-balancing test, the Court specifically rejected that suggestion." *Id.* Moreover, strict and intermediate scrutiny do not, as the dissent asserts (at 19), "obviously require assessment of the 'costs and benefits' of government regulations." Rather, they require an assessment of whether a particular law will serve an important or compelling governmental interest; that is not a comparative judgment.

If the Supreme Court truly intended to rule out any form of heightened scrutiny for all Second Amendment cases, then it surely would have said at least something to that effect. *Cf. Heller*, 554 U.S. at 628 n.27 (expressly rejecting rational basis review). The Court did not say anything of the sort; the plaintiffs in this case do not suggest it did; and the idea that *Heller* precludes heightened scrutiny has eluded every circuit to have addressed that question since *Heller* was issued. *See* First Circuit: *United States v. Booker*, 644 F.3d 12, 25 (2011)

(requiring "a substantial relationship between the restriction and an important governmental objective"); Third Circuit: *Marzzarella*, 614 F.3d at 97 (applying intermediate scrutiny); Fourth Circuit: *United States v. Masciandaro*, 638 F.3d 458, 471 (2011) (same); *Chester*, 628 F.3d at 683 (same); *id.* at 690 (Davis, J., concurring) (same); Seventh Circuit: *Ezell*, 2011 WL 2623511, at *17 (applying "more rigorous showing" than intermediate scrutiny, "if not quite 'strict scrutiny'"); *id.* at *21–22 (Rovner J., concurring) (endorsing intermediate scrutiny); *Williams*, 616 F.3d at 692–93 (applying intermediate scrutiny); *United States v. Skoien*, 614 F.3d 638, 641–42 (2010) (en banc) (upholding law upon assumption intermediate scrutiny applies); Ninth Circuit: *Nordyke*, 644 F.3d at 786 n.9 (reserving "precisely what type of heightened scrutiny applies to laws that substantially burden Second Amendment rights"); *id.* at 795 (Gould J., concurring in part, "would subject to heightened scrutiny only arms regulations falling within the core purposes of the Second Amendment" and "would subject incidental burdens on the Second Amendment right ... to reasonableness review"); Tenth Circuit: *Reese*, 627 F.3d at 802 (applying intermediate scrutiny).

The dissent (at 30–31) takes us to task for suggesting a restriction on a core enumerated constitutional right can be subjected to intermediate scrutiny. This assertion, true or false, is simply misplaced; we apply intermediate scrutiny precisely because the District's laws do not affect the core right protected by the Second Amendment. *See supra* at 22–24, 31–32.

Unlike our dissenting colleague, we read *Heller* straightforwardly: The Supreme Court there left open and untouched even by implication the issue presented in this case. The Court held the ban on handguns unconstitutional

without at the same time adopting any particular level of scrutiny for Second Amendment cases because it concluded that "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home the most preferred firearm in the nation to keep and use for protection of one's home and family would fail constitutional muster." *Id.* at 628–29 (internal quotation marks and citation omitted); *McDonald*, 130 S. Ct. at 3036 (quoting *Heller*, 554 U.S. at 628–30). Nothing in *Heller* suggests a case involving a restriction significantly less severe than the total prohibition of handguns at issue there could or should be resolved without reference to one or another of the familiar constitutional "standards of scrutiny." On the contrary, the Supreme Court was explicit in cautioning that because *Heller* was its "first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field." *Heller*, 554 U.S. at 635; *see also, e.g.*, *Ezell*, 2011 WL 2623511, at *13 (with the exception of "broadly prohibitory laws restricting the core Second Amendment right," courts are "left to choose an appropriate standard of review from among the heightened standards of scrutiny the Court applies to governmental actions alleged to infringe enumerated constitutional rights"); *Chester*, 628 F.3d at 682 ("*Heller* left open the level of scrutiny applicable to review a law that burdens conduct protected under the Second Amendment, other than to indicate that rational-basis review would not apply in this context"); Volokh, *supra*, at 1456 ("The Court [in *Heller*] did not discuss what analysis would be proper for less 'severe' restrictions, likely because it had no occasion to").

Having rejected the possibility of heightened scrutiny, the dissent (at 31) goes on to find in *Heller* this proposition: "Gun bans and gun regulations that are not longstanding or sufficiently rooted in text, history, and tradition are not

consistent with the Second Amendment individual right." We do not see this purportedly "up-front" test "announced" anywhere in the Court's opinion. The Court in *Heller* said certain "longstanding" regulations are "presumptively lawful," 554 U.S. at 626–27 & n.26, but it nowhere suggested, nor does it follow logically, that a regulation must be longstanding or "rooted in text, history, and tradition" in order to be constitutional. As we have said, the Court struck down the handgun ban because it so severely restricted the core Second Amendment right of self-defense in the home that it "would fail constitutional muster" under any standard of scrutiny. Likewise, the Court invalidated the District's requirement that handguns "in the home be rendered and kept inoperable" because that requirement "makes it impossible for citizens to use them for the core lawful purpose of self-defense." *Id.* at 630. The Court in *Heller* did consider whether there were historical analogues to the handgun ban, but only to note, primarily in response to Justice Breyer's dissent, that because earlier laws were far less restrictive, they did not support the constitutionality of a ban on handguns. *See id.* at 632 ("Nothing about [the] fire-safety laws" cited by Justice Breyer "undermines our analysis; they do not remotely burden the right of self-defense as much as an absolute ban on handguns"); *id.* ("other founding-era laws" cited by Justice Breyer "provide no support for the severe restriction in the present case"). In any event, we think it clear *Heller* did not announce the "up-front" test applicable to all Second Amendment cases that our dissenting colleague goes to great lengths to "divine" from that opinion.

In sum, *Heller* explicitly leaves many questions unresolved and says nothing to cast doubt upon the propriety of the lower courts applying some level of heightened scrutiny in a Second Amendment challenge to a law significantly less restrictive than the outright ban on all

handguns invalidated in that case. Although *Heller* renders longstanding regulations presumptively constitutional, it nowhere suggests a law must be longstanding or rooted in text, history, and tradition to be constitutional.

## B. Registration Requirements

Our dissenting colleague contends (at 47) the historical registration laws we cite do not support the District's basic registration requirement because to rely upon those laws as historical precedents "is to conduct the *Heller* analysis at an inappropriately high level of generality." In fact, however, the historical regulations and the District's basic registration requirement are not just generally alike, they are practically identical: They all require gun owners to give an agent of the Government basic information about themselves and their firearm.

In any event, we do not decide, but rather remand to the district court, the question whether the District's novel registration requirements and all its registration requirements as applied to long guns withstand intermediate scrutiny. *See supra* at 28. Accordingly, those registration requirements will be deemed constitutional only if the District shows they serve its undoubtedly important governmental interests in preventing crimes and protecting police officers.

## C. Assault Weapons

In arguing *Heller* requires holding unconstitutional the District's ban on certain semi-automatic rifles, the dissent relies heavily upon the idea that *Heller* held possession of semi-automatic handguns is "constitutionally protected." The Court's holding in *Heller* was in fact narrower, condemning as unconstitutional a prohibition of all handguns, that is, a ban

on the "entire class of 'arms' that is overwhelmingly chosen by American society for [the] lawful purpose" of self-defense. 554 U.S. at 628. A narrower prohibition, such as a ban on certain semi-automatic pistols, may also "fail constitutional muster," *id.*, but that question has not yet been decided by the Supreme Court.[*] Therefore, the dissent (at 32–33) mischaracterizes the question before us as whether "the Second Amendment protects semi-automatic *handguns* but not semi-automatic *rifles*." The dissent at (38 n.16) insists it is "implausible" to read *Heller* as "protect[ing] handguns that are revolvers but not handguns that are semi-automatic." We do not, however, hold possession of semi-automatic handguns is outside the protection of the Second Amendment. We simply do not read *Heller* as foreclosing every ban on every possible sub-class of handguns or, for that matter, a ban on a sub-class of rifles. *See Marzzarella*, 614 F.3d at 101 (upholding prohibition on possession of handguns with serial numbers obliterated); *cf.* Joseph Blocher, *Categoricalism and Balancing in First and Second Amendment Analysis*, 84 N.Y.U. L. Rev. 375, 422 (2009) (*Heller* "avoided—perhaps in part because it had little cause to consider—categorization at the level of classification: that is, the creation of subcategories that may warrant only intermediate protection").[**]

---

[*] Indeed, as we noted in Part I, the present plaintiffs, whilst in the district court, separately and specifically challenged the ban on certain semi-automatic pistols.

[**] Moreover, despite the dissent's contrary assertion (at 36), a number of states and municipalities, representing over one fourth of the Nation's population, ban semi-automatic rifles or assault weapons, and these bans are by no means "significantly narrower" than the District's ban. *See* N.Y. Penal Law §§ 265.00(22), 265.02(7), 265.10 (prohibiting possession, manufacture, disposal, and transport of assault weapons, including AR-15); Conn. Gen. Stat. §§ 53-202a, 53-202c (prohibiting possession of semiautomatic firearms, including AR-15); Cal. Penal Code §§ 12276–12282

The dissent, indulging us by assuming some level of heightened scrutiny applies, maintains (at 37) "D.C. cannot show a compelling interest in banning semi-automatic rifles." Why not? "[B]ecause the necessary implication of the decision in *Heller* is that D.C. could not show a sufficiently compelling interest to justify its banning semi-automatic handguns." That conclusion, however, is neither to be found in nor inferred from *Heller*. As we explain above, the Court in *Heller* held the District's ban on all handguns would fail constitutional muster under any standard of scrutiny because the handgun is the "quintessential" self-defense weapon. *See* 554 U.S. at 629 ("There are many reasons that a citizen may prefer a handgun for home defense: It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift

(same); Haw. Rev. Stat. §§ 134-1, 134-4, 134-8 (banning assault pistols); Mass. Gen. Laws ch. 140, §§ 121–123 (banning assault weapons as defined in expired federal law); Md. Code, Criminal Law, §§ 4-301–4-306 (prohibiting assault pistols); N.J. Stat. Ann. §§ 2C:39-1(w), 2C:39-5 (prohibiting assault firearms, including AR-15); Legal Cmty. Against Violence, *Regulating Guns in America: An Evaluation and Comparative Analysis of Federal, State, and Selected Local Guns Laws*, 25–26 (Feb. 2008), http://www.lcav.org/publications-briefs/reports_analyses/RegGuns.entire.report.pdf (Boston, Cleveland, Columbus, and New York City prohibit assault weapons, including semi-automatic rifles); Aurora, Ill., Code of Ordinances § 29-49 (prohibiting assault weapons, including AR-15); City Code of Buffalo N.Y. § 180-1 (prohibiting assault weapons, including assault rifles); Denver Colo. Mun. Code § 38-130 (same); City of Rochester Code § 47-5 (same). In fact, the District's prohibition is very similar to the nationwide ban on assault weapons that was in effect from 1994 to 2004. *See* 18 U.S.C. §§ 921(a)(30), 922(v)(1) (prohibiting possession of semi-automatic rifles and pistols, including AR-15).

and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police"). The same cannot be said of semi-automatic rifles.

Finally, in criticizing our application of intermediate scrutiny to the ban on assault weapons, our dissenting colleague says (at 33, 40) "it is difficult to make the case that semi-automatic rifles are significantly more dangerous than semi-automatic handguns" "because handguns can be concealed." It is not our place, however, to determine in the first instance whether banning semi-automatic rifles in particular would promote important law-enforcement objectives. Our role is narrower, *viz.*, to determine whether the District has presented evidence sufficient to "establish the reasonable fit we require" between the law at issue and an important or substantial governmental interest. *Fox*, 492 U.S. at 480.

KAVANAUGH, *Circuit Judge*, dissenting: The Second Amendment to the Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment confers "an individual right to keep and bear arms." 554 U.S. 570, 595 (2008). In *McDonald v. City of Chicago*, the Court added that the right to keep and bear arms is a "fundamental" constitutional right implicit in our scheme of ordered liberty and "deeply rooted in this Nation's history and tradition." 130 S. Ct. 3020, 3036, 3042 (2010).

In *Heller*, the Court ruled that the District of Columbia's ban on the possession of handguns violated the Second Amendment. 554 U.S. at 635. In the wake of *Heller*, the District of Columbia enacted a new gun law. As relevant here, D.C. bans possession of most semi-automatic rifles and requires registration of all guns possessed in the District of Columbia. *See* D.C. Code §§ 7-2501.01(3A)(A)(i), 7-2502.01-.10.

In this case, we are called upon to assess those provisions of D.C.'s law under *Heller*. In so doing, we are of course aware of the longstanding problem of gun violence in the District of Columbia. In part for that reason, *Heller* has engendered substantial controversy. *See, e.g.*, J. Harvie Wilkinson III, *Of Guns, Abortions, and the Unraveling Rule of Law*, 95 VA. L. REV. 253 (2009); Richard A. Posner, *In Defense of Looseness*, THE NEW REPUBLIC, Aug. 27, 2008, at 32. As a lower court, however, it is not our role to re-litigate *Heller* or to bend it in any particular direction. Our sole job is to faithfully apply *Heller* and the approach it set forth for analyzing gun bans and regulations.

In my judgment, both D.C.'s ban on semi-automatic rifles and its gun registration requirement are unconstitutional under *Heller*.

In *Heller*, the Supreme Court held that handguns – the vast majority of which today are semi-automatic – are constitutionally protected because they have not traditionally been banned and are in common use by law-abiding citizens. There is no meaningful or persuasive constitutional distinction between semi-automatic handguns and semi-automatic rifles. Semi-automatic rifles, like semi-automatic handguns, have not traditionally been banned and are in common use by law-abiding citizens for self-defense in the home, hunting, and other lawful uses. Moreover, semi-automatic *handguns* are used in connection with violent crimes far more than semi-automatic *rifles* are. It follows from *Heller*'s protection of semi-automatic handguns that semi-automatic rifles are also constitutionally protected and that D.C.'s ban on them is unconstitutional. (By contrast, fully automatic weapons, also known as machine guns, have traditionally been banned and may continue to be banned after *Heller*.)[1]

D.C.'s registration requirement, which is significantly more stringent than any other federal or state gun law in the United States, is likewise unconstitutional. *Heller* and later *McDonald* said that regulations on the sale, possession, or use

---

[1] A semi-automatic gun "fires only one shot with each pull of the trigger" and "requires no manual manipulation by the operator to place another round in the chamber after each round is fired." *Staples v. United States*, 511 U.S. 600, 602 n.1 (1994). A fully automatic gun – also known as a machine gun – "fires repeatedly with a single pull of the trigger. That is, once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted." *Id.*

of guns are permissible if they are within the class of traditional, "longstanding" gun regulations in the United States. Registration of all lawfully possessed guns – as distinct from licensing of gun owners or mandatory record-keeping by gun sellers – has not traditionally been required in the United States and even today remains highly unusual. Under *Heller*'s history- and tradition-based test, D.C.'s registration requirement is therefore unconstitutional.[2]

It bears emphasis that *Heller*, while enormously significant jurisprudentially, was not revolutionary in terms of its immediate real-world effects on American gun regulation. Indeed, *Heller* largely preserved the status quo of gun regulation in the United States. *Heller* established that traditional and common gun laws in the United States remain constitutionally permissible. The Supreme Court simply pushed back against an outlier local law – D.C.'s handgun ban – that went far beyond the traditional line of gun regulation. As *Heller* emphasized: "Few laws in the history of our Nation have come close to the severe restriction of the District's" law. 554 U.S. at 629.[3]

---

[2] Plaintiffs also challenge D.C.'s ban on magazines of more than 10 rounds. I would remand that issue for further factual development in the District Court. *See infra* note 20.

[3] In that sense, *Heller* was similar in its overarching practical and real-world ramifications to recent Supreme Court decisions such as *Brown v. Entertainment Merchants Ass'n*, 131 S. Ct. 2729 (2011); *Graham v. Florida*, 130 S. Ct. 2011 (2010); *Kennedy v. Louisiana*, 554 U.S. 407 (2008); and *Romer v. Evans*, 517 U.S. 620 (1996). Those decisions disapproved novel or uncommon state legislative efforts to regulate beyond traditional boundaries in areas that affected enumerated individual constitutional rights – California's law banning sale of violent video games, Florida's law permitting life without parole for certain juvenile crimes, Louisiana's law permitting the death penalty for certain rapes, and

After *Heller*, however, D.C. seemed not to heed the Supreme Court's message. Instead, D.C. appeared to push the envelope again, with its new ban on semi-automatic rifles and its broad gun registration requirement. D.C.'s public safety motivation in enacting these laws is worthy of great respect. But the means D.C. has chosen are again constitutionally problematic. The D.C. gun provisions at issue here, like the ban at issue in *Heller*, are outliers that are not traditional or common in the United States. As with D.C.'s handgun ban, therefore, holding these D.C. laws unconstitutional would not lead to nationwide tumult. Rather, such a holding would maintain the balance historically and traditionally struck in the United States between public safety and the individual right to keep arms – a history and tradition that *Heller* affirmed and adopted as determining the scope of the Second Amendment right.

I

A key threshold question in this case concerns the constitutional test we should employ to assess the challenged provisions of the D.C. gun law. The *Heller* Court held that the Second Amendment guarantees an individual right to

---

Colorado's law prohibiting gay people from receiving protection from discrimination. Because those laws were outliers, the decisions invalidating them did not cause major repercussions throughout the Nation. *Heller* was a decision in that same vein, in terms of its immediate practical effects in the United States. By contrast, of course, some Supreme Court decisions interpreting the Constitution's individual rights provisions not only are significant jurisprudentially but also have substantial practical impacts on common federal or state practices. *See, e.g.*, *Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527 (2009); *Arizona v. Gant*, 556 U.S. 332 (2009); *United States v. Booker*, 543 U.S. 220 (2005). *Heller* was not a decision of that kind.

possess guns. But the Court emphasized that the Second Amendment does not protect "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). "Like most rights, the right secured by the Second Amendment is not unlimited." *Id.*

In light of that limiting language in *Heller*, constitutional analysis of D.C.'s new law raises two main questions. Under *Heller*, what kinds of firearms may the government ban? And what kinds of regulations may the government impose on the sale, possession, or use of firearms?

Put in simple terms, the issue with respect to what test to apply to gun bans and regulations is this: Are gun bans and regulations to be analyzed based on the Second Amendment's text, history, and tradition (as well as by appropriate analogues thereto when dealing with modern weapons and new circumstances, *see infra* Part I.B)? Or may judges re-calibrate the scope of the Second Amendment right based on judicial assessment of whether the law advances a sufficiently compelling or important government interest to override the individual right? And if the latter, is the proper test strict scrutiny or intermediate scrutiny?

As I read *Heller*, the Supreme Court was not silent about the answers to those questions. Rather, the Court set forth fairly precise guidance to govern those issues going forward.

A

In my view, *Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny. To be sure, the Court never said something as succinct as "Courts should not apply strict or

intermediate scrutiny but should instead look to text, history, and tradition to define the scope of the right and assess gun bans and regulations." But that is the clear message I take away from the Court's holdings and reasoning in the two cases.

As to bans on categories of guns, the *Heller* Court stated that the government may ban classes of guns that have been banned in our "historical tradition" – namely, guns that are "dangerous and unusual" and thus are not "the sorts of lawful weapons that" citizens typically "possess[] at home." 554 U.S. at 627. The Court said that "dangerous and unusual weapons" are equivalent to those weapons not "in common use," as the latter phrase was used in *United States v. Miller*, 307 U.S. 174, 179 (1939). *Heller*, 554 U.S. at 627. Thus, the "Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns" or automatic "M-16 rifles and the like." *Id.* at 625, 627. That interpretation, the Court explained, "accords with the historical understanding of the scope of the right." *Id.* at 625. "Constitutional rights," the Court said, "are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id.* at 634-35. The scope of the right is thus determined by "historical justifications." *Id.* at 635. And tradition (that is, post-ratification history) also matters because "examination of a variety of legal and other sources to determine the public understanding of a legal text in the period after its enactment or ratification" is a "critical tool of constitutional interpretation." *Id.* at 605 (emphasis omitted).

Because the D.C. law at issue in *Heller* banned handguns (including semi-automatic handguns), which have not

traditionally been banned and are in common use by law-abiding citizens, the Court found that the D.C. ban on handgun possession violated the Second Amendment. Stressing the D.C. law's inconsistency with our "historical tradition," *id.* at 627, the Court stated that "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's" law, *id.* at 629.

As to regulations on the sale, possession, or use of guns, *Heller* similarly said the government may continue to impose regulations that are traditional, "longstanding" regulations in the United States. *Id.* at 626-27. In *McDonald*, the Court reiterated that "longstanding regulatory measures" are permissible. *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3047 (2010) (controlling opinion of Alito, J.). Importantly, the *Heller* Court listed several examples of such longstanding (and therefore constitutionally permissible) regulations, such as laws against concealed carry and laws prohibiting possession of guns by felons. 554 U.S. at 626. The Court stated that analysis of whether other gun regulations are permissible must be based on their "historical justifications." *Id.* at 635.[4]

---

[4] The Court in *Heller* stated as follows:

Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues. Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion

8

In disapproving D.C.'s ban on handguns, in approving a ban on machine guns, and in approving longstanding regulations such as concealed-carry and felon-in-possession laws, *Heller* established that the scope of the Second Amendment right – and thus the constitutionality of gun bans and regulations – is determined by reference to text, history, and tradition. As to the ban on handguns, for example, the Supreme Court in *Heller* never asked whether the law was

---

should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

We also recognize another important limitation on the right to keep and carry arms. *Miller* said, as we have explained, that the sorts of weapons protected were those "in common use at the time." We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons."

554 U.S. at 626-27 (citations and footnote omitted). The Court in *McDonald* reiterated:

As evidence that the Fourteenth Amendment has not historically been understood to restrict the authority of the States to regulate firearms, municipal respondents and supporting *amici* cite a variety of state and local firearms laws that courts have upheld. But what is most striking about their research is the paucity of precedent sustaining bans comparable to those at issue here and in *Heller*. . . . We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as "prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."

130 S. Ct. at 3047 (controlling opinion of Alito, J.) (quoting *Heller*, 554 U.S. at 626-27).

narrowly tailored to serve a compelling government interest (strict scrutiny) or substantially related to an important government interest (intermediate scrutiny). If the Supreme Court had meant to adopt one of those tests, it could have said so in *Heller* and measured D.C.'s handgun ban against the relevant standard. But the Court did not do so; it instead determined that handguns had not traditionally been banned and were in common use – and thus that D.C.'s handgun ban was unconstitutional.

Moreover, in order for the Court to prospectively approve the constitutionality of several kinds of gun laws – such as machine gun bans, concealed-carry laws, and felon-in-possession laws – the Court obviously had to employ *some* test. Yet the Court made no mention of strict or intermediate scrutiny when approving such laws. Rather, the test the Court relied on – as it indicated by using terms such as "historical tradition" and "longstanding" and "historical justifications" – was one of text, history, and tradition. *Id.* at 626-27, 635; *see* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443, 1463 (2009) ("Absent [from *Heller*] is any inquiry into whether the law is necessary to serve a compelling government interest in preventing death and crime, though handgun ban proponents did indeed argue that such bans are necessary to serve those interests and that no less restrictive alternative would do the job."); Joseph Blocher, *Categoricalism and Balancing in First and Second Amendment Analysis*, 84 N.Y.U. L. REV. 375, 380 (2009) ("Rather than adopting one of the First Amendment's many Frankfurter-inspired balancing approaches, the majority endorsed a categorical test under which some types of 'Arms' and arms-usage are protected absolutely from bans and some types of 'Arms' and people are excluded entirely from constitutional coverage."); *id.* at 405 (*Heller* "neither requires

nor permits any balancing beyond that accomplished by the Framers themselves.").[5]

B

Before addressing the majority opinion's contrary analysis of *Heller* and *McDonald*, it is important to underscore two points regarding *Heller*'s focus on text, history, and tradition.

*First*, just because gun regulations are assessed by reference to history and tradition does not mean that governments lack flexibility or power to enact gun regulations. Indeed, governments appear to have *more* flexibility and power to impose gun regulations under a test based on text, history, and tradition than they would under strict scrutiny. After all, history and tradition show that a variety of gun regulations have co-existed with the Second Amendment right and are consistent with that right, as the Court said in *Heller*.[6] By contrast, if courts applied strict

---

[5] The Court's failure to employ strict or intermediate scrutiny appears to have been quite intentional and well-considered. *Cf.* Tr. of Oral Arg. at 44, *Heller*, 554 U.S. 570 (No. 07-290) (Chief Justice Roberts: "Well, these various phrases under the different standards that are proposed, 'compelling interest,' 'significant interest,' 'narrowly tailored,' none of them appear in the Constitution . . . . I mean, these standards that apply in the First Amendment just kind of developed over the years as sort of baggage that the First Amendment picked up.").

[6] It is not uncommon for courts to look to post-ratification history and tradition to inform the interpretation of a constitutional provision. For example, when interpreting the scope of the President's Article II power, the Court has relied on such history and tradition. *See Dames & Moore v. Regan*, 453 U.S. 654, 679 n.8 (1981). So, too, the Court looked to traditional practice when analyzing an Establishment Clause issue related to legislative

scrutiny, then presumably very few gun regulations would be upheld. Indeed, Justice Breyer made this point in his dissent in *Heller* when he noted that the majority opinion had listed certain permissible gun regulations "whose constitutionality under a strict-scrutiny standard would be far from clear." 554 U.S. at 688 (Breyer, J., dissenting).[7]

So the major difference between applying the *Heller* history- and tradition-based approach and applying one of the forms of scrutiny is not necessarily the number of gun regulations that will pass muster. Instead, it is that the *Heller* test will be more determinate and "much less subjective" because "it depends upon a body of evidence susceptible of reasoned analysis rather than a variety of vague ethico-political First Principles whose combined conclusion can be found to point in any direction the judges favor." *McDonald*, 130 S. Ct. at 3058 (Scalia, J., concurring).

---

prayer. *See Marsh v. Chambers*, 463 U.S. 783, 786-92 (1983). That said, post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text. The Court in *Marbury* found unconstitutional a law passed by the First Congress. *See Marbury v. Madison*, 5 U.S. 137 (1803). The practice of separate but equal was inconsistent with and repugnant to the text and original meaning of the Equal Protection Clause. *See Brown v. Bd. of Education*, 347 U.S. 483 (1954); *Strauder v. West Virginia*, 100 U.S. 303 (1880). The existence of post-ratification examples of congressional exclusion of elected members did not persuade the Court in *Powell v. McCormack*: "That an unconstitutional action has been taken before surely does not render that same action any less unconstitutional at a later date." 395 U.S. 486, 546-47 (1969).

[7] The fact that fewer gun laws might pass muster under strict scrutiny than under a history- and tradition-based approach is no doubt why the plaintiffs in *Heller* and here have advocated strict scrutiny.

To be sure, analyzing the history and tradition of gun laws in the United States does not always yield easy answers. Justice Scalia, the author of the *Heller* majority opinion, thus acknowledged in his concurrence in *McDonald*: "No fundamental right – not even the First Amendment – is absolute. The traditional restrictions go to show the scope of the right, not its lack of fundamental character. . . . Historical analysis can be difficult; it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it. I will stipulate to that." *Id.* at 3056-57. That said, the range of potential answers will be far more focused under an approach based on text, history, and tradition than under an interest-balancing test such as intermediate scrutiny. *See id.* at 3057 n.9.

*Second*, when legislatures seek to address new weapons that have not traditionally existed or to impose new gun regulations because of conditions that have not traditionally existed, there obviously will not be a history or tradition of banning such weapons or imposing such regulations. That does not mean the Second Amendment does not apply to those weapons or in those circumstances. Nor does it mean that the government is powerless to address those new weapons or modern circumstances. Rather, in such cases, the proper interpretive approach is to reason by analogy from history and tradition. *See Parker v. District of Columbia*, 478 F.3d 370, 398 (D.C. Cir. 2007) ("[J]ust as the First Amendment free speech clause covers modern communication devices unknown to the founding generation, e.g., radio and television, and the Fourth Amendment protects telephonic conversation from a 'search,' the Second Amendment protects the possession of the *modern-day equivalents* of the colonial pistol.") (emphasis added), *aff'd sub nom. Heller*, 554 U.S. 570; Tr. of Oral Arg. at 77, *Heller*,

554 U.S. 570 (No. 07-290) (Chief Justice Roberts: "[Y]ou would define 'reasonable' in light of the restrictions that existed at the time the amendment was adopted. . . . [Y]ou can't take it into the marketplace was one restriction. So that would be – we are talking about lineal descendents of the arms but presumably there are lineal descendents of the restrictions as well."); *cf. Kyllo v. United States*, 533 U.S. 27, 31-35 (2001) (applying traditional Fourth Amendment standards to novel thermal imaging technology); *California v. Ciraolo*, 476 U.S. 207, 213 (1986) (allowing government to view property from airplanes based on common-law principle that police could look at property when passing by homes on public thoroughfares).

The Constitution is an enduring document, and its principles were designed to, and do, apply to modern conditions and developments. The constitutional principles do not change (absent amendment), but the relevant principles must be faithfully applied not only to circumstances as they existed in 1787, 1791, and 1868, for example, but also to modern situations that were unknown to the Constitution's Framers. To be sure, applying constitutional principles to novel modern conditions can be difficult and leave close questions at the margins. But that is hardly unique to the Second Amendment. It is an essential component of judicial decisionmaking under our enduring Constitution.

C

The majority opinion here applies intermediate scrutiny and contends that intermediate scrutiny is consistent with *Heller* and *McDonald*. The majority opinion employs history and tradition only as a threshold screen to determine whether the law in question implicates the individual right; if so, the majority opinion then subjects the individual right to

balancing under the intermediate scrutiny test. As explained above, I disagree with that approach. I read *Heller* and *McDonald* as setting forth a test based wholly on text, history, and tradition. Deeper examination of the two Supreme Court opinions – and, in particular, how the Court's opinions responded to the dissents in the two cases – buttresses my conclusion.

Turning first to *Heller*: The back and forth between the *Heller* majority opinion and Justice Breyer's dissent underscores that the proper Second Amendment test focuses on text, history, and tradition. In his dissent, Justice Breyer suggested that the Court should follow the lead of certain First Amendment cases, among others, that had applied a form of intermediate-scrutiny interest balancing:

> The fact that important interests lie on both sides of the constitutional equation suggests that review of gun-control regulation is not a context in which a court should effectively presume either constitutionality (as in rational-basis review) or unconstitutionality (as in strict scrutiny). Rather, "where a law significantly implicates competing constitutionally protected interests in complex ways," the Court generally asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests. See *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 402 (2000) (Breyer, J., concurring). . . .

> In particular this Court, in First Amendment cases applying intermediate scrutiny, has said that our "sole obligation" in reviewing a legislature's "predictive judgments" is "to assure that, in formulating its judgments," the legislature "has drawn reasonable

inferences based on substantial evidence." *Turner*, 520 U.S., at 195 (internal quotation marks omitted). And judges, looking at the evidence before us, should agree that the District legislature's predictive judgments satisfy that legal standard. . . .

There is no cause here to depart from the standard set forth in *Turner*, for the District's decision represents the kind of empirically based judgment that legislatures, not courts, are best suited to make. See *Nixon*, 528 U.S., at 402 (Breyer, J., concurring). . . .

The upshot is that the District's objectives are compelling; its predictive judgments as to its law's tendency to achieve those objectives are adequately supported; the law does impose a burden upon any self-defense interest that the Amendment seeks to secure; and there is no clear less restrictive alternative.

*Heller*, 554 U.S. at 689-90, 704-05, 714 (Breyer, J., dissenting).

Justice Breyer expressly rejected strict scrutiny and rational basis review. Instead, he explicitly referred to intermediate scrutiny and relied on cases such as *Turner Broadcasting* that had applied intermediate scrutiny. *See Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180, 189-225 (1997). And he discussed the strength of the government's interest and the fit between the law and those interests, as the Court does when applying heightened scrutiny. It is thus evident that Justice Breyer's *Heller* dissent advocated a form of intermediate scrutiny.[8]

---

[8] The *Heller* majority stated that Justice Breyer was not proposing any of the traditional forms of scrutiny "*explicitly at*

The Court responded to Justice Breyer by rejecting his "judge-empowering 'interest-balancing inquiry' that 'asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.'" *Heller*, 554 U.S. at 634 (quoting *id.* at 689-90 (Breyer, J., dissenting)). The Court stated rather emphatically: "We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach. The very enumeration of the right takes out of the hands of government – even the Third Branch of Government – the power to decide on a case-by-case basis whether the right is *really worth* insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all." *Id.*

---

*least*." 554 U.S. at 634 (emphasis added). Justice Breyer ruled out strict scrutiny and rational basis review and relied heavily on *Turner Broadcasting*, which had applied a form of intermediate scrutiny. But he was not explicit about the label for his test, as the *Heller* majority opinion noted. In that regard, it bears mention that strict scrutiny and intermediate scrutiny can take on different forms in different contexts that are sometimes colloquially referred to as, for example, strict-scrutiny-light or intermediate-scrutiny-plus or the like. How strong the government interest must be, how directly the law must advance that interest, how reasonable the alternatives must be – those questions are not always framed with precision in two clearly delineated categories, as opposed to points on a sliding scale of heightened scrutiny approaches. *See, e.g.*, *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 387-88 (2000) ("a contribution limit involving significant interference with associational rights could survive if the Government demonstrated that contribution regulation was closely drawn to match a sufficiently important interest") (citations and internal quotation marks omitted); *United States v. Virginia*, 518 U.S. 515, 531, 533 (1996) (referring to "skeptical scrutiny" and "heightened review" of gender-based law).

In rejecting a judicial interest-balancing approach, the Court explained that the Second Amendment "is the very *product* of an interest balancing by the people" that judges should not "now conduct for them anew." *Id.* at 635. The Court added that judges may not alter the scope of the Amendment because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id.* at 634-35. The Court emphasized that the scope of the right was determined by "historical justifications." *Id.* at 635. And the Court stated that tradition (that is, post-ratification history) matters because "examination of a variety of legal and other sources to determine the public understanding of a legal text in the period after its enactment or ratification" is a "critical tool of constitutional interpretation." *Id.* at 605 (emphasis omitted).

To be sure, the Court noted in passing that D.C.'s handgun ban would fail under any level of heightened scrutiny or review the Court applied. *Id.* at 628-29. But that was more of a gilding-the-lily observation about the extreme nature of D.C's law – and appears to have been a pointed comment that the dissenters should have found D.C.'s law unconstitutional even under their own suggested balancing approach – than a statement that courts may or should apply strict or intermediate scrutiny in Second Amendment cases. We know as much because the Court expressly dismissed Justice Breyer's *Turner Broadcasting* intermediate scrutiny approach and went on to demonstrate how courts should consider Second Amendment bans and regulations – by analysis of text, history, and tradition. *Id.* at 626-27, 634-35.

Is it possible, however, that the *Heller* Court was ruling out intermediate scrutiny but leaving open the possibility that

strict scrutiny might apply? That seems highly unlikely, for reasons Justice Breyer himself pointed out in dissent:

> Respondent proposes that the Court adopt a "strict scrutiny" test, which would require reviewing with care each gun law to determine whether it is "narrowly tailored to achieve a compelling governmental interest." *Abrams v. Johnson*, 521 U.S. 74, 82 (1997); see Brief for Respondent 54-62. But the majority implicitly, and appropriately, rejects that suggestion by broadly approving a set of laws – prohibitions on concealed weapons, forfeiture by criminals of the Second Amendment right, prohibitions on firearms in certain locales, and governmental regulation of commercial firearm sales – whose constitutionality under a strict-scrutiny standard would be far from clear.

*Id.* at 688 (Breyer, J., dissenting).

Justice Breyer thus perceived that the Court's history- and tradition-based approach would likely permit governments to enact *more* gun laws and regulations than a strict scrutiny approach would allow. History and tradition establish that several gun regulations have co-existed with the Second Amendment right and are consistent with that right, as the Court determined in *Heller*. If courts applied strict scrutiny, however, very few gun regulations would presumably be constitutional.

Even more to the point, as Justice Breyer also noted, the Court in *Heller* affirmatively *approved* a slew of gun laws – machine gun bans, concealed-carry laws, felon-in-possession laws, and the like – without analyzing them under strict scrutiny. The Court approved them based on a history- and tradition-based test, not strict scrutiny. Indeed, these laws might not have passed muster under a strict scrutiny analysis.

The Court's later decision in *McDonald* underscores that text, history, and tradition guide analysis of gun laws and regulations. There, the Court again precluded the use of balancing tests; furthermore, it expressly rejected judicial assessment of "the costs and benefits of firearms restrictions" and stated that courts applying the Second Amendment thus would not have to make "difficult empirical judgments" about the efficacy of particular gun regulations. 130 S. Ct. at 3050 (controlling opinion of Alito, J.).

That language from *McDonald* is critically important because strict and intermediate scrutiny obviously require assessment of the "costs and benefits" of government regulations and entail "difficult empirical judgments" about their efficacy – precisely what *McDonald* barred. *McDonald*'s rejection of such inquiries, which was even more direct than *Heller*'s, is flatly incompatible with a strict or intermediate scrutiny approach to gun regulations.

That conclusion is fortified by a careful examination of the back and forth in *McDonald* between Justice Alito's controlling opinion and Justice Breyer's dissent.

In his *McDonald* dissent, Justice Breyer explained at some length that he was concerned about the practical ramifications of *Heller* and *McDonald* because judges would have great difficulty assessing gun regulations under heightened scrutiny (whether it might be called strict or intermediate or something else on that heightened scrutiny spectrum). He stated that determining the constitutionality of a gun regulation would "almost always require the weighing of the constitutional right to bear arms against the primary concern of every government – a concern for the safety and indeed the lives of its citizens." 130 S. Ct. at 3126 (Breyer, J., dissenting) (internal quotation marks omitted). "Given the

competing interests, courts will have to try to answer empirical questions of a particularly difficult kind." *Id.* He listed a variety of possible gun laws that would raise such difficult empirical questions, including laws regulating semi-automatic rifles and laws imposing registration requirements. *Id.* Justice Breyer asserted that assessing the constitutionality of those laws under heightened scrutiny would require difficult judicial evaluations of the effectiveness of particular gun laws. Justice Breyer asked: "How can the Court assess the strength of the government's regulatory interests without addressing issues of empirical fact? How can the Court determine if a regulation is appropriately tailored without considering its impact? And how can the Court determine if there are less restrictive alternatives without considering what will happen if those alternatives are implemented?" *Id.* at 3127.

The questions identified by Justice Breyer are of course the kinds of questions that courts ask when applying heightened scrutiny. So how did the Court respond to Justice Breyer? The Court simply rejected the premise of Justice Breyer's criticism. Those kinds of difficult assessments would not need to be made, the Court said, because courts would not be applying that kind of test or scrutiny: "Justice Breyer is incorrect that incorporation will require judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise. As we have noted, while his opinion in *Heller* recommended an interest-balancing test, the Court specifically rejected that suggestion. 'The very enumeration of the right takes out of the hands of government – even the Third Branch of Government – the power to decide on a case-by-case basis whether the right is *really worth* insisting upon.'" *Id.* at 3050 (controlling opinion of Alito, J.) (citation omitted) (quoting *Heller*, 554 U.S. at 684). The Court also

reiterated that "longstanding" gun regulations were constitutionally permissible. *Id.* at 3047.

The *McDonald* Court's response to Justice Breyer is quite telling for our purposes: The Court dismissed the suggestion that courts in Second Amendment cases would need to assess the strength of the government's regulatory interests, or determine whether the regulation was appropriately tailored, or consider the alternatives. In other words, the Court declined to conduct the kinds of inquiries that would need to be conducted under a form of strict or intermediate scrutiny.

But Justice Breyer then asked: From where did the Court derive the exceptions the Court listed in *Heller* and *McDonald* allowing laws that ban concealed carry, possession by a felon, and the like? Justice Breyer suggested that the Court "simply invented rules that sound sensible." *Id.* at 3127 (Breyer, J., dissenting). But the Court responded that, no, it was not inventing rules but rather was holding that the scope of the right was determined by text, history, and tradition – and that "longstanding regulatory measures" were therefore permissible. *Id.* at 3047 (controlling opinion of Alito, J.). As the Court had explained in *Heller*, the scope of the right was determined by text, history, and tradition, and such longstanding laws were within the historical understanding of the scope of the right. *See also McDonald*, 130 S. Ct. at 3050, 3056 (Scalia, J., concurring) (Court's approach "makes the traditions of our people paramount"; "traditional restrictions" on the right are permissible).

D

Although *Heller* and *McDonald* rejected judicial interest balancing, the majority opinion here applies intermediate scrutiny. The majority opinion does so because it says that

heightened scrutiny tests are not actually balancing tests and thus were not precluded by the Supreme Court's rejection of balancing tests. I disagree with the majority opinion's attempt to distinguish *Heller* and *McDonald* in this way.

To begin with, as explained above, the Court in my view went further in *Heller* and *McDonald* than just rejecting the concept of balancing tests. The Court emphasized the role of history and tradition; it rejected not only balancing but also examination of costs and benefits; it disclaimed the need for difficult empirical judgments; it specifically rejected Justice Breyer's approach, which was a form of intermediate scrutiny as applied in *Turner Broadcasting*; and it prospectively blessed certain laws for reasons that could be (and were) explained only by history and tradition, not by analysis under a heightened scrutiny test.

It is ironic, moreover, that Justice Breyer's dissent explicitly advocated an approach based on *Turner Broadcasting*; that the *Heller* majority flatly rejected that *Turner Broadcasting*-based approach; and that the majority opinion here nonetheless turns around and relies expressly and repeatedly on *Turner Broadcasting*. *See Heller*, 554 U.S. at 690, 704-05 (Breyer, J., dissenting) (citing *Turner Broadcasting*, 520 U.S. 180); *Heller*, 554 U.S. at 634-35; Maj. Op. at 22-23, 26-28 (citing *Turner Broadcasting*, 520 U.S. 180; *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622 (1994)).

In addition, the premise of the majority opinion's more general point – that *Heller*'s rejection of balancing tests does not mean it rejected strict and intermediate scrutiny – is incorrect. Strict and intermediate scrutiny are balancing tests and thus are necessarily encompassed by *Heller*'s more general rejection of balancing.

23

The heightened scrutiny approach largely took hold as a First Amendment principle – articulated most prominently by Justices Frankfurter and Harlan – to uphold laws that infringed free speech rights but were deemed to be justified by an overriding public purpose, often in cases involving speech by Communists. *See Konigsberg v. State Bar of California*, 366 U.S. 36, 49-52 (1961); *Barenblatt v. United States*, 360 U.S. 109, 126-27, 134 (1959); *Sweezy v. New Hampshire*, 354 U.S. 234, 265-67 (1957) (Frankfurter, J., concurring in judgment). From the beginning, it was recognized that those tests were balancing tests. In *Barenblatt*, for example, one of the early cases applying a form of what we now call strict scrutiny, the Court stated that First Amendment rights may be overcome based on "a balancing by the courts of the competing private and public interests at stake in the particular circumstances shown," and that the "subordinating interest of the State must be compelling in order to overcome the individual constitutional rights at stake." 360 U.S. at 126-27 (internal quotation marks omitted). In *Konigsberg*, the Court similarly explained that laws limiting speech could be justified by "valid governmental interests, a prerequisite to constitutionality which has necessarily involved a weighing of the governmental interest involved." 366 U.S. at 50-51. Writing for the Court, Justice Harlan noted that the test required an "appropriate weighing of the respective interests involved." *Id.* at 51. In dissent, Justice Black objected to a "doctrine that permits constitutionally protected rights to be 'balanced' away whenever a majority of this Court thinks that a State might have interest sufficient to justify abridgment of those freedoms." *Id.* at 61 (Black, J., dissenting).

As in their original formulations, the successor strict and intermediate scrutiny tests applied today remain quintessential balancing inquiries that focus ultimately on whether a

particular government interest is sufficiently compelling or important to justify an infringement on the individual right in question. *Cf. Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 740-41 (1996) (the Court's application of varying levels of scrutiny is a process of "restat[ing] and refin[ing] . . . basic First Amendment principles, adopting them more particularly to the balance of competing interests and the special circumstances of each field of application"); *Employment Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 889 n.5 (1990) (applying strict scrutiny to general laws that burden religious practice would require judges to "regularly balance against the importance of general laws the significance of religious practice"); Mario L. Barnes & Erwin Chemerinsky, *The Once and Future Equal Protection Doctrine?*, 43 CONN. L. REV. 1059, 1080 (2011) ("The levels of scrutiny are essentially balancing tests – each test determines how the weights on the scale are to be arranged. Strict scrutiny puts the weights strongly against the government and rational basis places the weights in its favor."); Alan Brownstein, *The Religion Clauses as Mutually Reinforcing Mandates*, 32 CARDOZO L. REV. 1701, 1721-22 (2011) (though strict scrutiny is not as "ad hoc, subjective and indeterminate" as a "multi-factor balancing test" or "intermediate level scrutiny," even under strict scrutiny "there will be some cases, where the state's interest is authentic and substantial, which will require balancing"); Stephen A. Siegel, *The Origin of the Compelling State Interest Test and Strict Scrutiny*, 48 AM. J. LEGAL HIST. 355, 375 (2006) ("compelling state interest doctrine" is a "balancing test") (internal quotation marks omitted); Darrell A.H. Miller, *Retail Rebellion and the Second Amendment*, 86 IND. L.J. 939, 967 (2011) ("both *Heller* and *McDonald* indicate strongly that standards of scrutiny are just shorthand for unguided interest balancing").

To be sure, application of the strict and intermediate scrutiny tests yields categorical results and rules over time. And strict scrutiny in particular places a heavy thumb on the scale in favor of the individual right in question, meaning the balance is often struck against the government. But the tests are undoubtedly balancing tests that require a contemporary judicial assessment of the strength of the asserted government interests in imposing a particular regulation. If that interest is deemed sufficiently strong, and the law is deemed to be appropriately tailored to serving that interest given the potential alternatives, then the law generally overcomes the individual right. That is a form of interest balancing. It is true that strict and intermediate scrutiny come in a variety of flavors and are not always applied in the exact same way in all settings (as illustrated by Justice Breyer's extensive explanation in his *Heller* dissent). But they always involve at least some assessment of whether the law in question is sufficiently important to justify infringement on an individual constitutional right. That's balancing. And *Heller* and *McDonald* rejected the use of balancing tests – including, therefore, strict or intermediate scrutiny – in fleshing out the scope of the Second Amendment right.

Of course, as noted above, *Heller* and *McDonald* didn't just reject interest balancing. The Court went much further by expressly rejecting Justice Breyer's intermediate scrutiny approach, disclaiming cost-benefit analysis, and denying the need for empirical inquiry. By doing so, the Court made clear, in my view, that strict and intermediate scrutiny are inappropriate.

In short, I do not see how *Heller* and *McDonald* can be squared with application of strict or intermediate scrutiny to D.C.'s gun laws. The majority opinion here refers to the levels of scrutiny as "familiar." Maj. Op. at 40. As one

commentator has stated, however, "the search for the familiar may be leading courts and commentators astray: The central disagreement in *Heller* was a debate not about strict scrutiny and rational basis review but rather about categoricalism and balancing." Blocher, *Categoricalism and Balancing in First and Second Amendment Analysis*, 84 N.Y.U. L. REV. at 379.[9] That disagreement in *Heller* was resolved in favor of categoricalism – with the categories defined by text, history, and tradition – and against balancing tests such as strict or intermediate scrutiny or reasonableness.

E

It might be objected that the Supreme Court could not have intended a test cabined by text, history, and tradition (and analogues thereto when addressing modern weapons or conditions) given the prevalence of strict and intermediate scrutiny tests in the Court's jurisprudence regarding some other constitutional rights. I disagree with that suggestion and think it is based on too narrow a view of the Court's overall constitutional jurisprudence.

Taking a step back, we know the Supreme Court has developed an array of rules, tests, and standards specific to each right. Particularly for a lower court, it is difficult therefore to apply an overarching interpretive approach to questions of constitutional law that are necessarily guided by decades of precedent interpreting different provisions of the Constitution under different methodologies. Some individual constitutional rights are analyzed under heightened (strict or intermediate) scrutiny, some under categorical tests divined

---

[9] I recognize that some other courts of appeals have adopted approaches similar to the majority opinion's approach here. Based on my reading of *Heller* and *McDonald*, I respectfully have come to a different conclusion.

from text, history, and tradition, some by reasonableness tests, some in other ways.

Strict and intermediate scrutiny today are primarily used in substantive due process and equal protection cases, and for certain aspects of First Amendment free speech doctrine. Strict and intermediate scrutiny tests are not employed in the Court's interpretation and application of many other individual rights provisions of the Constitution.

For example, the Court has not typically invoked strict or intermediate scrutiny to analyze the Jury Trial Clause, the Establishment Clause, the Self-Incrimination Clause, the Confrontation Clause, the Cruel and Unusual Punishments Clause, or the Habeas Corpus Clause, to name a few. *See, e.g.*, *Kennedy v. Louisiana*, 554 U.S. 407 (2008); *Boumediene v. Bush*, 553 U.S. 723 (2008); *United States v. Booker*, 543 U.S. 220 (2005); *Lee v. Weisman*, 505 U.S. 577 (1992); *Lefkowitz v. Turley*, 414 U.S. 70 (1973). In a recent landmark case concerning the Confrontation Clause, the Court stated in language quite similar to *Heller*'s that by "replacing categorical constitutional guarantees with open-ended balancing tests, we do violence to their design. Vague standards are manipulable." *Crawford v. Washington*, 541 U.S. 36, 67-68 (2004).

Even in the First Amendment case law, which the majority opinion here looks to for guidance, the Court has not used strict or intermediate scrutiny when considering bans on categories of speech. In *United States v. Stevens*, the Court echoed *Heller*: "The First Amendment's guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits. The First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the

Government outweigh the costs. Our Constitution forecloses any attempt to revise that judgment simply on the basis that some speech is not worth it. The Constitution is not a document 'prescribing limits, and declaring that those limits may be passed at pleasure.'" 130 S. Ct. 1577, 1585 (2010) (quoting *Marbury v. Madison*, 5 U.S. 137, 178 (1803)); *see also Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 125 (1991) (Kennedy, J., concurring) (When the "regulated content has the full protection of the First Amendment," that "is itself a full and sufficient reason for holding the statute unconstitutional. In my view it is both unnecessary and incorrect to ask whether the State can show that the statute is necessary to serve a compelling state interest and is narrowly drawn to achieve that end.") (internal quotation marks omitted).

In short, it would hardly have been unusual or unthinkable for the Supreme Court to set forth a Second Amendment test based on text, history, and tradition – rather than a heightened scrutiny approach. (Indeed, in *Heller*, the Supreme Court affirmed this Court's decision, which similarly declined to adopt a strict or intermediate scrutiny test.) Therefore, I would take the Supreme Court's words in *Heller* and *McDonald* at face value and not superimpose on those opinions a strict or intermediate scrutiny test that the Court declined to apply.

F

To sum up so far: Because the Supreme Court in *Heller* did not adopt a strict or intermediate scrutiny test and rejected judicial interest balancing, I must disagree with the majority opinion's decision in this case to adopt the intermediate scrutiny balancing test. In my view, it is a severe stretch to read *Heller*, as the majority opinion does, as consistent with

an intermediate scrutiny balancing test. The Supreme Court struck down D.C.'s handgun ban because handguns have not traditionally been banned and are in common use by law-abiding citizens, not because the ban failed to serve an important government interest and thus failed the intermediate scrutiny test. And the Court endorsed certain gun laws because they were rooted in history and tradition, not because they passed the intermediate scrutiny test.

One final aside about the appropriate test to apply: Even if it were appropriate to apply one of the levels of scrutiny after *Heller*, surely it would be strict scrutiny rather than the intermediate scrutiny test adopted by the majority opinion here. *Heller* ruled that the right to possess guns is a core enumerated constitutional right and rejected Justice Breyer's suggested *Turner Broadcasting* intermediate scrutiny approach. And *McDonald* later held that "the right to keep and bear arms" is "among those fundamental rights necessary to our system of ordered liberty." 130 S. Ct. at 3042.

For those fundamental substantive constitutional rights that the Court has subjected to a balancing test and analyzed under one of the levels of scrutiny – for example, the First Amendment freedom of speech and the rights protected by substantive due process – the Court has generally employed strict scrutiny to assess direct infringements on the right. *See, e.g.*, *Citizens United v. FEC*, 130 S. Ct. 876, 898 (2010) (First Amendment strict scrutiny in context of infringement on "political speech"); *Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000) (First Amendment strict scrutiny in context of infringement on freedom of association); *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 813 (2000) (First Amendment strict scrutiny in context of content-based speech regulation); *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (substantive due process doctrine "forbids the

government to infringe fundamental liberty interests . . . unless the infringement is narrowly tailored to serve a compelling state interest") (internal quotation marks and alteration omitted); *see generally* Richard H. Fallon, Jr., *Strict Judicial Scrutiny*, 54 UCLA L. REV. 1267, 1271 (2007) ("the Supreme Court adopted the strict scrutiny formula as its generic test for the protection of fundamental rights").

Strict scrutiny requires the government to show that a law is narrowly tailored to serve a compelling state interest. *See Citizens United*, 130 S. Ct. at 898 (strict scrutiny "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest") (internal quotation marks omitted). This test strongly favors the individual right in question. *See Brown v. Entertainment Merchants Ass'n*, 131 S. Ct. 2729, 2738 (2011) (strict scrutiny "is a demanding standard"); *Vieth v. Jubelirer*, 541 U.S. 267, 294 (2004) (plurality opinion) (strict scrutiny imposes "a strong presumption of invalidity" with a "thumb on the scales" in favor of the individual right); *Dunn v. Blumstein*, 405 U.S. 330, 343 (1972) (under strict scrutiny, "a heavy burden of justification is on the State").

It is especially inappropriate for the majority opinion here to apply intermediate scrutiny rather than strict scrutiny to D.C.'s ban on semi-automatic rifles. No court of appeals decision since *Heller* has applied intermediate scrutiny to a ban on a class of arms that have not traditionally been banned and are in common use. A ban on a class of arms is not an "incidental" regulation. It is equivalent to a ban on a category of speech. Such restrictions on core enumerated constitutional protections are *not* subjected to mere intermediate scrutiny review. The majority opinion here is in uncharted territory in suggesting that intermediate scrutiny

can apply to an outright ban on possession of a class of weapons that have not traditionally been banned.

## G

In sum, our task as a lower court here is narrow and constrained by precedent. We need not squint to divine some hidden meaning from *Heller* about what tests to apply. *Heller* was up-front about the role of text, history, and tradition in Second Amendment analysis – and about the absence of a role for judicial interest balancing or assessment of costs and benefits of gun regulations. Gun bans and gun regulations that are longstanding – or, put another way, sufficiently rooted in text, history, and tradition – are consistent with the Second Amendment individual right. Gun bans and gun regulations that are not longstanding or sufficiently rooted in text, history, and tradition are not consistent with the Second Amendment individual right. Our role as a lower court is simply to apply the test announced by *Heller* to the challenged provisions of D.C.'s new gun laws.

## II

Whether we apply the *Heller* history- and tradition-based approach or strict scrutiny or even intermediate scrutiny, D.C.'s ban on semi-automatic rifles fails to pass constitutional muster. D.C.'s registration requirement is likewise unconstitutional.

## A

The first issue concerns D.C.'s ban on most semi-automatic rifles.[10] A semi-automatic gun "fires only one shot

---

[10] D.C.'s law bans semi-automatic rifles by listing specific guns that, as relevant here, share the characteristics of being a long

with each pull of the trigger" and "requires no manual manipulation by the operator to place another round in the chamber after each round is fired." *Staples v. United States*, 511 U.S. 600, 602 n.1 (1994). That is in contrast to an automatic gun – also known as a machine gun – which "fires repeatedly with a single pull of the trigger. That is, once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted." *Id.*[11]

The vast majority of handguns today are semi-automatic.[12] In *Heller*, the Supreme Court ruled that D.C.'s law banning handguns, including semi-automatic handguns, was unconstitutional. *District of Columbia v. Heller*, 554 U.S. 570, 628-29 (2008). This case concerns semi-automatic rifles.[13] As with handguns, a significant percentage of rifles are semi-automatic. D.C. asks this Court to find that the

---

gun and firing in a semi-automatic manner, and typically have features such as protruding pistol grips. D.C. Code § 7-2501.01(3A)(A)(i)(I). The statute also includes a catchall provision covering semi-automatic rifles that have certain additional features such as protruding pistol grips. *Id.* § 7-2501.01(3A)(A)(i)(IV).

[11] Under federal law, the "term 'machinegun' means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b).

[12] *See* CHRISTOPHER S. KOPER, REPORT TO THE NAT'L INST. OF JUSTICE, U.S. DEP'T OF JUSTICE 81 (2004) (80% of handguns produced in 1993 were semi-automatic); DEP'T OF JUSTICE, GUNS USED IN CRIME 3 (1995) ("Most new handguns are pistols rather than revolvers.").

[13] Rifles are within a broader category referred to as "long guns." Long guns, such as rifles and shotguns, are intended to be fired from the shoulder instead of with a single hand and are generally defined as being at least 16 to 18 inches long.

Second Amendment protects semi-automatic *handguns* but not semi-automatic *rifles*.

There is no basis in *Heller* for drawing a constitutional distinction between semi-automatic handguns and semi-automatic rifles.

As an initial matter, considering just the public safety rationale invoked by D.C., semi-automatic handguns are more dangerous as a class than semi-automatic rifles because handguns can be concealed. As was noted by the dissent in *Heller*, handguns "are the overwhelmingly favorite weapon of armed criminals." 554 U.S. at 682 (Breyer, J., dissenting); *see also* FBI, CRIME IN THE UNITED STATES, 2009 tbl.20 (2010). So it would seem a bit backwards – at least from a public safety perspective – to interpret the Second Amendment to protect semi-automatic handguns but not semi-automatic rifles. Indeed, at oral argument, the excellent Solicitor General for D.C. acknowledged that "an argument could be made that the government interest in banning handguns is just as compelling, if not more compelling" than the government interest in banning semi-automatic rifles. Tr. of Oral Arg. at 35. He added that "the government's interest may be more compelling with regard to handgun[s]." *Id.* at 36. Counsel's frank acknowledgment highlights the serious hurdle that *Heller* erects in the way of D.C.'s attempt to ban semi-automatic rifles. Put simply, it would strain logic and common sense to conclude that the Second Amendment protects semi-automatic handguns but does not protect semi-automatic rifles.[14]

---

[14] Some would respond that the Second Amendment should not protect semi-automatic handguns either. But that option is not open to us after *Heller*. The question therefore is whether a sensible and principled constitutional line can be drawn between

More to the point for purposes of the *Heller* analysis, the Second Amendment as construed in *Heller* protects weapons that have not traditionally been banned and are in common use by law-abiding citizens. Semi-automatic rifles have not traditionally been banned and are in common use today, and are thus protected under *Heller*.

The first commercially available semi-automatic rifles, the Winchester Models 1903 and 1905 and the Remington Model 8, entered the market between 1903 and 1906. *See* JOHN HENWOOD, THE 8 AND THE 81: A HISTORY OF REMINGTON'S PIONEER AUTOLOADING RIFLES 5 (1993); JOHN HENWOOD, THE FORGOTTEN WINCHESTERS: A HISTORY OF THE MODELS 1905, 1907, AND 1910 SELF-LOADING RIFLES 2-6 (1995). (The first semi-automatic shotgun, designed by John Browning and manufactured by Remington, hit the market in 1905 and was a runaway commercial success. *See* HENWOOD, 8 AND THE 81, at 4.) Other arms manufacturers, including Standard Arms and Browning Arms, quickly brought their own semi-automatic rifles to market. *See id.* at 64-69. Five-shot magazines were standard, but as early as 1907, Winchester was offering the general public ten-shot magazines for use with its .351 caliber semi-automatic rifles. *See* HENWOOD, THE FORGOTTEN WINCHESTERS 22-23. Many of the early semi-automatic rifles were available with pistol grips. *See id.* at 117-24. These semi-automatic rifles were designed and marketed primarily for use as hunting rifles, with a small ancillary market among law enforcement officers. *See* HENWOOD, 8 AND THE 81, at 115-21.

---

semi-automatic handguns and semi-automatic rifles. I think not. Such a line might be drawn out of a bare desire to restrict *Heller* as much as possible or to limit it to its facts, but that is not a sensible or principled constitutional line for a lower court to draw or a fair reading of the *Heller* opinion, in my view.

By contrast, full automatics were developed for the battlefield and were never in widespread civilian use in the United States. Rifle-caliber machine guns (excluding the Gatling gun, which required hand cranking) first saw widespread use in the European colonial powers' African conquests of the 1890s. *See* JOHN ELLIS, THE SOCIAL HISTORY OF THE MACHINE GUN 79-107 (1986). Automatic, pistol-caliber machine guns were fielded by European militaries toward the end of World War I. The Thompson machine gun (commonly known as the "Tommy gun") entered commercial sale in the United States in the mid-1920s but saw very limited civilian use outside of organized crime and law enforcement. *See* LEE KENNETT & JAMES LAVERNE ANDERSON, THE GUN IN AMERICA 203-04 (1975). Within less than a decade, the Tommy gun and other automatic weapons had been subjected to comprehensive federal regulation. National Firearms Act, ch. 757, 48 Stat. 1236 (1934); *see also* 18 U.S.C. § 922(*o*).

Semi-automatic rifles remain in common use today, as even the majority opinion here acknowledges. *See* Maj. Op. at 30 ("We think it clear enough in the record that semi-automatic rifles . . . are indeed in 'common use,' as the plaintiffs contend."). According to one source, about 40 percent of rifles sold in 2010 were semi-automatic. *See* NICHOLAS J. JOHNSON ET AL., FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY ch. 1 (forthcoming 2012). The AR-15 is the most popular semi-automatic rifle; since 1986, about two million semi-automatic AR-15 rifles have been manufactured. J.A. 84 (Declaration of Firearms Researcher Mark Overstreet). In 2007, the AR-15 *alone* accounted for 5.5 percent of firearms and 14.4 percent of rifles produced in the United States for the domestic market. *Id.* A brief perusal of the website of a popular American gun seller underscores the point that semi-

automatic rifles are quite common in the United States. *See, e.g.*, CABELA'S, http://www.cabelas.com. Semi-automatic rifles are commonly used for self-defense in the home, hunting, target shooting, and competitions. J.A. 137 (Declaration of Firearms Expert Harold E. Johnson). And many hunting guns are semi-automatic. *Id.*

Although a few states and municipalities ban some categories of semi-automatic rifles, most of the country does not, and even the bans that exist are significantly narrower than D.C.'s. What the Supreme Court said in *Heller* as to D.C.'s handgun ban thus applies just as well to D.C.'s new semi-automatic rifle ban: "Few laws in the history of our Nation have come close to the severe restriction of the District's" law. 554 U.S. at 629.

What is more, in its 1994 decision in *Staples*, the Supreme Court already stated that semi-automatic weapons "traditionally have been widely accepted as lawful possessions." 511 U.S. at 612. Indeed, the precise weapon at issue in *Staples* was the AR-15. The AR-15 is the quintessential semi-automatic rifle that D.C. seeks to ban here. Yet as the Supreme Court noted in *Staples*, the AR-15 is in common use by law-abiding citizens and has traditionally been lawful to possess. By contrast, as the Court stated in *Staples* and again in *Heller*, short-barreled shotguns and automatic "M-16 rifles and the like" are not in common use and have been permissibly banned by Congress. *Heller*, 554 U.S. at 625, 627; *see also Staples*, 511 U.S. at 611-12 ("certain categories of guns – no doubt including the machineguns, sawed-off shotguns, and artillery pieces that Congress has subjected to regulation – . . . have the same quasi-suspect character we attributed to owning hand grenades," but "guns falling outside those categories traditionally have been widely accepted as lawful

possessions"); 18 U.S.C. § 922(*o*)(1) ("it shall be unlawful for any person to transfer or possess a machinegun").[15]

The Supreme Court's statement in *Staples* that semi-automatic rifles are traditionally and widely accepted as lawful possessions further demonstrates that such guns are protected under the *Heller* history- and tradition-based test. The government may still ban automatic firearms (that is, machine guns), which traditionally have been banned. But the government may not generally ban semi-automatic guns, whether semi-automatic rifles, shotguns, or handguns.

Even if it were appropriate to apply some kind of balancing test or level of scrutiny to D.C.'s ban on semi-automatic rifles, the proper test would be strict scrutiny, as explained above. *See supra* Part I.F. That is particularly true where, as here, a court is analyzing a ban on a *class* of arms within the scope of Second Amendment protection. If we are to apply strict scrutiny, we must do so in a manner consistent with *Heller*'s holding that D.C.'s handgun ban was unconstitutional. But D.C. cannot show a compelling interest in banning semi-automatic rifles because the necessary implication of the decision in *Heller* is that D.C. could not show a sufficiently compelling interest to justify its banning semi-automatic handguns.

For its part, the majority opinion analyzes D.C.'s ban on semi-automatic rifles under an intermediate scrutiny balancing test. Even if the majority opinion were right that intermediate scrutiny is the proper test, the majority opinion's

---

[15] In our decision in *Parker*, we similarly stated that handguns, shotguns, and rifles have traditionally been possessed by law-abiding citizens and are within the protection of the Second Amendment. *Parker v. District of Columbia*, 478 F.3d 370, 398 (D.C. Cir. 2007), *aff'd sub nom. Heller*, 554 U.S. 570.

application of intermediate scrutiny here is unconvincing: The fundamental flaw in the majority opinion is that it cannot persuasively explain why semi-automatic handguns are constitutionally protected (as *Heller* held) but semi-automatic rifles are not.

In attempting to distinguish away *Heller*'s protection of semi-automatic handguns, the majority opinion suggests that semi-automatic rifles are almost as dangerous as automatic rifles (that is, machine guns) because semi-automatic rifles fire "almost as rapidly." Maj. Op. at 34. Putting aside that the majority opinion's data indicate that semi-automatics actually fire two-and-a-half times slower than automatics, *id.*, the problem with the comparison is that semi-automatic *rifles* fire at the same general rate as semi-automatic *handguns*. And semi-automatic handguns are constitutionally protected under the Supreme Court's decision in *Heller*. So the majority opinion cannot legitimately distinguish *Heller* on that basis. *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443, 1484 (2009) ("The laws generally define assault weapons to be a set of semiautomatic weapons (fully automatic weapons have long been heavily regulated, and lawfully owned fully automatics are very rare and very expensive) that are little different from semiautomatic pistols and rifles that are commonly owned by tens of millions of law-abiding citizens. 'Assault weapons' are no more 'high power' than many other pistols and rifles that are not covered by the bans.") (footnote omitted).[16]

---

[16] In passing, the majority opinion here tosses out the possibility that *Heller* might protect handguns that are revolvers but not handguns that are semi-automatic pistols. *See* Maj. Op. at 43. I find that an utterly implausible reading of *Heller* given the Court's

The majority opinion next contends that semi-automatic handguns are good enough to meet people's needs for self-defense and that they shouldn't need semi-automatic rifles. But that's a bit like saying books can be banned because people can always read newspapers. That is not a persuasive or legitimate way to analyze a law that directly infringes an enumerated constitutional right. Indeed, *Heller* itself specifically rejected this mode of reasoning: "It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed." 554 U.S. at 629; *see also Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007) ("The District contends that since it only bans one type of firearm, 'residents still have access to hundreds more,' and thus its prohibition does not implicate the Second Amendment because it does not threaten total disarmament. We think that argument frivolous. It could be similarly contended that all firearms may be banned so long as sabers were permitted."), *aff'd sub nom. Heller*, 554 U.S. 570. Furthermore, the majority opinion's assertion does not sufficiently account for the fact that rifles, but typically not handguns, are used for hunting. *Cf. Heller*, 554 U.S. at 599 (most founding-era Americans "undoubtedly" thought right to own firearms "even more important for self-defense and hunting" than for militia service).

In support of its law, D.C. suggests that semi-automatic rifles are "offensive" and not just "defensive." But that is plainly true of semi-automatic handguns as well (after all, handguns are far and away the guns most often used in violent crimes), and yet the Supreme Court held semi-automatic handguns to be constitutionally protected. Moreover, it's hard

---

many blanket references to handguns and given that most handguns are semi-automatic.

to see why, if a gun is effective for "offense," it might not also be effective for "defense." If a gun is employed by criminals on the offense who are willing to violate laws and invade homes, for example, their potential victims will presumably want to be armed with similarly effective weapons for their defense. *Cf. Heller*, 554 U.S. at 711 (Breyer, J., dissenting) ("the very attributes that make handguns particularly useful for self-defense are also what make them particularly dangerous"). There is no reason to think that semi-automatic rifles are not effective for self-defense in the home, which *Heller* explained is a core purpose of the Second Amendment right. The offense/defense distinction thus doesn't advance the analysis here, at least in part because it is the person, not the gun, who determines whether use of the gun is offensive or defensive. Perhaps D.C. – by referring to the offense/defense distinction – is simply intending to say that semi-automatic rifles are especially dangerous. But it is difficult to make the case that semi-automatic rifles are significantly more dangerous than semi-automatic handguns, and the Supreme Court has already held semi-automatic handguns to be constitutionally protected.

D.C. repeatedly refers to the guns at issue in this case as "assault weapons." But if we are constrained to use D.C.'s rhetoric, we would have to say that *handguns* are the quintessential "assault weapons" in today's society; they are used far more often than any other kind of gun in violent crimes. *See* BUREAU OF JUSTICE STATISTICS, PUB. NO. 194820, WEAPON USE AND VIOLENT CRIME 3 (2003) (87% of violent crimes committed with firearms between 1993 and 2001 were committed with handguns). So using the rhetorical term "assault weapon" to refer to semi-automatic rifles does not meaningfully distinguish semi-automatic rifles from semi-automatic handguns. Nor does the rhetorical term "assault

weapon" help make the case that semi-automatic rifles may be banned even though semi-automatic handguns are constitutionally protected.

Under intermediate scrutiny, yet another problem with D.C.'s law is its tailoring. The law is not sufficiently tailored even with respect to the category of semi-automatic rifles. It bans certain semi-automatic rifles but not others – with no particular explanation or rationale for why some made the list and some did not. The list appears to be haphazard. It does not reflect the kind of tailoring that is necessary to justify infringement of a fundamental right, even under the more relaxed intermediate scrutiny test.

In short, the majority opinion cannot persuasively explain why semi-automatic handguns are constitutionally protected but semi-automatic rifles are not. In *Heller*, D.C. argued that it could ban handguns because individuals could still own rifles. That argument failed. Here, D.C. contends that it can ban rifles because individuals can still own handguns. D.C.'s at-least-you-can-still-possess-other-kinds-of-guns argument is no more persuasive this time around. Under the *Heller* history- and tradition-based test, or the strict scrutiny test, or even the majority opinion's own intermediate scrutiny test, the D.C. ban on semi-automatic rifles is unconstitutional.

B

The second main issue on appeal concerns D.C.'s gun registration regime. D.C. requires registration of all guns lawfully possessed in D.C. The Supreme Court in *Heller* expressly allowed "*longstanding* prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of

arms." 554 U.S. at 626-27 (emphasis added). The Court added that regulations and exceptions should be judged based on their "historical justifications." *Id.* at 635. In *McDonald*, the Court summarized the point this way: "We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.'" *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3047 (2010) (controlling opinion of Alito, J.) (quoting *Heller*, 554 U.S. at 626-27).[17]

The fundamental problem with D.C.'s gun registration law is that registration of lawfully possessed guns is not "longstanding." Registration of all guns lawfully possessed by citizens in the relevant jurisdiction has not been traditionally required in the United States and, indeed, remains highly unusual today.

In considering D.C.'s registration requirement, it's initially important to distinguish registration laws from licensing laws. Licensing requirements mandate that gun owners meet certain standards or pass certain tests before

---

[17] With respect to guns that the government has the constitutional authority to ban – namely, those classes of weapons that have traditionally been banned and are not in common use by law-abiding citizens – the government may of course impose registration as a lesser step. *See United States v. Miller*, 307 U.S. 174, 175 n.1 (1939) (describing federal statute requiring registration of short-barreled rifles and shotguns, machine guns, and silencers transported in interstate commerce). But D.C.'s registration requirement applies to all guns, not just those it has the authority to ban.

owning guns or using them in particular ways. Those laws can advance gun safety by ensuring that owners understand how to handle guns safely, particularly before guns are carried in public. For example, many jurisdictions that permit the carrying of concealed weapons have traditionally imposed licensing requirements on persons who wish to carry such weapons. Registration requirements, by contrast, require registration of individual guns and do not meaningfully serve the purpose of ensuring that owners know how to operate guns safely in the way certain licensing requirements can. For that reason, registration requirements are often seen as half-a-loaf measures aimed at deterring gun ownership. It is true that registration requirements also provide a hook to convict (and potentially flip) criminals who are suspected of having committed other illegal acts, but as the majority opinion recognizes, that is a "circular" and constitutionally unacceptable rationale for requiring registration with respect to a core enumerated constitutional right. Maj. Op. at 25 n.*.

Likewise, it's also important at the outset to distinguish registration requirements imposed on gun *owners* from record-keeping requirements imposed on gun *sellers*. Some record-keeping requirements on gun sellers are traditional and common. Thus, the government may constitutionally impose certain record-keeping requirements on the sellers of guns. *See Heller*, 554 U.S. at 627 (listing "conditions and qualifications on the commercial sale of arms" as being within category of traditional gun regulations).

The issue here, however, is registration of all guns owned by people in the District of Columbia. As D.C. acknowledges, there is not, and never has been, a "comprehensive federal system of firearm registration." COUNCIL COMM. ON PUB. SAFETY & THE JUDICIARY, COMM. REP. ON B. 17-843, at 3 (D.C. 2008). Similarly, the vast

majority of states have not traditionally required registration of lawfully possessed guns. The majority opinion cites several state laws that have existed since the beginning of the 20th Century. Maj. Op. at 16-17. But those state laws generally required record-keeping by gun *sellers*, not registration of all lawfully possessed guns by gun *owners*. There certainly is no tradition in the United States of gun registration imposed on all guns. And laws regulating gun sellers provide no support for D.C.'s registration requirement, which compels every gun owner to register every gun he or she lawfully possesses.

Even if modern laws alone could satisfy *Heller*'s history- and tradition-based test, there presumably would have to be a strong showing that such laws are common in the states. *Cf. Kennedy v. Louisiana*, 554 U.S. 407, 423-26 (2008) (only six states permitting death penalty for child rapists shows national consensus *against* it). Such a showing cannot be made with respect to registration requirements. Today, most states require no registration for *any* firearms; only seven states require registration for *some* firearms; and only Hawaii requires registration for *all* firearms. And even Hawaii does not impose all of the onerous requirements associated with registration that D.C. does.[18] Put simply, D.C.'s registration

---

[18] The D.C. law at issue here requires far more than basic registration of guns. It mandates, among other things, that a gun owner submit every pistol for a "ballistics identification procedure," D.C. Code § 7-502.03(d); appear in person to register a gun, § 7-2502.04; register only one pistol every 30 days, § 7-2502.03(e); and renew each registration certificate every three years, § 7-2502.07a(a). It is undisputed in this case that D.C.'s myriad registration-related requirements are unique – and uniquely burdensome – among laws in the United States. These additional registration-related requirements find even less support in history and tradition than the basic registration requirement.

law is the strictest in the Nation, by D.C.'s own admission. *See* Firearms Control: Hearing of the H.C. Comm. on Home Aff. (U.K. 2010) (statement of Peter Nickles, D.C. Att'y Gen.) (acknowledging common view that D.C. has "the strictest gun laws in the United States"); *see also* Haw. Rev. Stat. § 134-3(a)-(b); Cal. Penal Code §§ 11106, 12276, 12276.1, 12276.5, 12280, 12285(a) (registration of handguns and certain rifles that are otherwise banned); Conn. Gen. Stat. § 53-202d(a) (registration of grandfathered rifles that are otherwise banned); Md. Code Ann., Crim. Law § 4-303(b) (registration of grandfathered pistols that are otherwise banned); N.J. Stat. Ann. §§ 2C:39-5(f), 2C:58-12 (registration of grandfathered weapons that are otherwise banned); La. Rev. Stat. Ann. §§ 40:1781, 40:1783 (registration of limited types of firearms); Mich. Comp. Laws § 28.422 (de facto registration of pistols).

Because the vast majority of states have not traditionally required and even now do not require registration of lawfully possessed guns, D.C.'s registration law – which is the strictest in the Nation and mandates registration of all guns – does not satisfy the history- and tradition-based test set forth in *Heller* and later *McDonald*.

D.C. contends that registration is a longstanding requirement in American law because early militia laws required militiamen to submit arms for inspection. *See* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 LAW & HIST. REV. 139, 161 (2007). But D.C.'s attempt to analogize its registration law to early militia laws is seriously flawed for two reasons. First, those early militia laws applied only to militiamen, not to all citizens. In general, men over age 45 and women did not have to comply with such laws. *See Heller*, 554 U.S. at 580 ("the militia in colonial America

consisted of a subset of the people – those who were male, able bodied, and within a certain age range") (internal quotation marks omitted).  Second, militia members were required to submit for inspection only one or a few firearms, not all of their firearms.  That's because the purpose of those early militia requirements was *not* registration of firearms, but rather simply to ensure that the militia was well-equipped.  *See, e.g.*, An Act for Amending the Several Laws for Regulating and Disciplining the Militia, and Guarding Against Invasions and Insurrections (1784), *in* 11 THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA 476, 476-79 (William Waller Hening ed., Richmond, George Cochran 1823) (The "defence and safety of the commonwealth depend upon having its citizens properly armed and taught the knowledge of military duty . . . .  [E]very of the said officers, non-commissioned officers, and privates, shall constantly keep the aforesaid arms, accoutrements and ammunition ready to be produced whenever called for by his commanding officer.").

Those militia requirements were a far cry from a registration requirement for all firearms.  Those laws therefore provide no meaningful support for D.C.'s broad and unprecedented registration law.  Nor has D.C. been able to find any other historical antecedents for its registration requirement.  Yet again, what the Supreme Court said in *Heller* with respect to D.C.'s handgun ban applies as well to D.C.'s registration requirement:  "Few laws in the history of our Nation have come close to the severe restriction of the District's" law.  554 U.S. at 629.

The Supreme Court's 1939 decision in *Miller* further suggests that registration of all lawfully possessed guns is not permissible under the Second Amendment.  *See United States v. Miller*, 307 U.S. 174 (1939).  *Miller* involved a defendant's

conviction for possessing an unregistered firearm. If registration were constitutionally permissible for all lawfully possessed guns, the Court could simply have affirmed the conviction on that ground. Instead, the *Miller* Court analyzed whether the kind of gun Miller possessed – a sawed-off shotgun – was within the class of weapons protected by the Second Amendment. The Court's approach suggested that the government could require registration only of guns that were outside the protection of the Second Amendment – namely, those classes of guns that the government had traditionally banned and that were not in common use, such as machine guns and sawed-off shotguns. *Id.* at 178; *see also Heller*, 554 U.S. at 622 (emphasizing that *Miller* turned on the "type of weapon at issue") (emphasis omitted). After all, if registration could be required for all guns, the Court could have just said so and ended its analysis; there would have been no need to go to the trouble of considering whether the gun in question was the kind protected under the Second Amendment.

Perhaps recognizing the dearth of historical or precedential support for its registration law, D.C. says that licensing laws are "conceptually similar" to registration requirements. D.C. Br. at 19. D.C. also advances a similar argument when citing the record-keeping laws for sellers as support for its registration requirement. But to rely on those laws to support registration requirements on gun owners for all of their guns is to conduct the *Heller* analysis at an inappropriately high level of generality – akin to saying that because the government traditionally could prohibit defamation, it can also prohibit speech criticizing government officials.

D.C.'s law requiring registration of all lawfully possessed guns in D.C. is not part of the tradition of gun regulation in

the United States; it is the most stringent such law in the Nation; and it is significantly more onerous than traditional licensing requirements or record-keeping requirements imposed only on gun sellers. Registration requirements of the kind enacted by D.C. thus do not satisfy the Supreme Court's history- and tradition-based test.

Even if it were proper to apply strict or intermediate scrutiny to D.C.'s registration law (as the majority opinion does), the registration requirement still would run into serious constitutional problems. If we were applying one of those balancing tests, however, I would remand: The current record is insufficient to render a final evaluation of the registration law under those balancing tests.

To begin with, it would be hard to persuasively say that the government has an interest sufficiently weighty to justify a regulation that infringes constitutionally guaranteed Second Amendment rights if the Federal Government and the states have not traditionally imposed – and even now do not commonly impose – such a regulation. *Cf. Brown v. Entertainment Merchants Ass'n*, 131 S. Ct. 2729, 2736 (2011) (considering First Amendment challenge to ban on sale of violent video games: "California's argument would fare better if there were a *longstanding tradition* in this country of specially restricting children's access to depictions of violence, but there is none.") (emphasis added); *United States v. Stevens*, 130 S. Ct. 1577, 1585 (2010) (considering First Amendment challenge to ban on depictions of animal cruelty: "we are unaware of any . . . tradition excluding depictions of animal cruelty from 'the freedom of speech' codified in the First Amendment") (emphasis omitted); *Romer v. Evans*, 517 U.S. 620, 633 (1996) ("It is not within our constitutional tradition to enact laws of this sort.").

Moreover, D.C.'s articulated basis for the registration requirement is that police officers, when approaching a house to execute a search or arrest warrant or take other investigative steps, will know whether the residents have guns. But that is at best a Swiss-cheese rationale because police officers obviously will assume the occupants might be armed regardless of what some central registration list might say. So this asserted rationale leaves far too many false negatives to satisfy strict or intermediate scrutiny with respect to burdens on a fundamental individual constitutional right.[19] D.C.'s registration law thus does not appear to be sufficiently tailored to advance a compelling or important government interest for purposes of the heightened scrutiny tests. That said, D.C. alludes to the possibility that other rationales might be asserted to support a registration requirement. Therefore,

---

[19] Moreover, citizens may not be forced to register in order to exercise certain other constitutionally recognized fundamental rights, such as to publish a blog or have an abortion. *See* Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense*, 56 UCLA L. REV. at 1546 (discussing impermissibility of registration requirements applied to free speech and abortion rights). In concluding that D.C.'s handgun registration requirement might satisfy intermediate scrutiny, the majority opinion notes that the government may require registration for voting. *See* Maj. Op. at 18. But those laws serve the significant government interest of preventing voter fraud. The majority opinion also cites car registration laws. *Id.* Of course, there is no enumerated constitutional right to own a car. Perhaps more to the point, those laws help prevent theft and assist recovery of stolen cars. No similar interest justifies gun registration laws.

Oddly, the majority opinion says that a registration requirement is permissible for handguns but might be impermissible for rifles or other long guns. *See id.* That approach gives potentially greater constitutional protection to long guns than to handguns even though *Heller* held that handguns warrant the highest constitutional protection.

if I were applying a form of heightened scrutiny to the registration requirement, I would remand for further analysis of the interests that might be asserted. (It is possible, moreover, that the registration law might pass intermediate but not strict scrutiny.)

In any event, the proper test to apply is *Heller*'s history- and tradition-based test. Because most of the Nation has never required – and even now does not require – registration of all lawfully possessed firearms, D.C.'s strict registration law is not "longstanding" in the United States. After *Heller*, some licensing requirements remain permissible, and some record-keeping requirements on gun sellers remain permissible. But D.C.'s registration law violates the Second Amendment as construed by the Supreme Court.

\* \* \*

This is a case where emotions run high on both sides of the policy issue because of the vital public safety interests at stake. As one who was born here, grew up in this community in the late 1960s, 1970s, and 1980s, and has lived and worked in this area almost all of his life, I am acutely aware of the gun, drug, and gang violence that has plagued all of us. As a citizen, I certainly share the goal of Police Chief Cathy Lanier to reduce and hopefully eliminate the senseless violence that has persisted for too long and harmed so many. And I greatly respect the motivation behind the D.C. gun laws at issue in this case. So my view on how to analyze the constitutional question here under the relevant Supreme Court precedents is not to say that I think certain gun registration laws or laws regulating semi-automatic guns are necessarily a bad idea as a matter of policy. If our job were to decree what we think is the best policy, I would carefully consider the issues through that different lens and might well look favorably upon certain

regulations of this kind. But our task is to apply the Constitution and the precedents of the Supreme Court, regardless of whether the result is one we agree with as a matter of first principles or policy. *See Texas v. Johnson*, 491 U.S. 397, 420-21 (1989) (Kennedy, J., concurring) ("The hard fact is that sometimes we must make decisions we do not like. We make them because they are right, right in the sense that the law and the Constitution, as we see them, compel the result."). A lower-court judge has a special obligation, moreover, to strictly and faithfully follow the lead of the "one supreme Court" established by our Constitution, regardless of whether the judge agrees or disagrees with the precedent.

D.C. believes that its law will help it fight violent crime. Few government responsibilities are more significant. That said, the Supreme Court has long made clear that the Constitution disables the government from employing certain means to prevent, deter, or detect violent crime. *See, e.g.*, *Mapp v. Ohio*, 367 U.S. 643 (1961); *Miranda v. Arizona*, 384 U.S. 436 (1966); *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000); *Crawford v. Washington*, 541 U.S. 36 (2004); *Kennedy v. Louisiana*, 554 U.S. 407 (2008); *District of Columbia v. Heller*, 554 U.S. 570 (2008). In the words of the Supreme Court, the courts must enforce those constitutional rights even when they have "controversial public safety implications." *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3045 (2010) (controlling opinion of Alito, J.).

As I read the relevant Supreme Court precedents, the D.C. ban on semi-automatic rifles and the D.C. gun registration requirement are unconstitutional and may not be enforced. We should reverse the judgment of the District

Court and remand for proceedings consistent with this opinion.[20] I respectfully dissent.

---

[20] The D.C. ban on magazines of more than 10 rounds requires analysis in the first instance by the District Court. In order to apply *Heller*'s test to this prohibition, we must know whether magazines with more than 10 rounds have traditionally been banned and are not in common use. The parties here did not brief that question in much detail. Evidence presented to the District Court on the history and prevalence of magazines of more than 10 rounds would be helpful to the proper disposition of that issue under the *Heller* test. Therefore, I would remand to the District Court for analysis of that issue.